## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MINNESOTA EDUCATION FUND and VIVIAN LATIMER TANNIEHILL, *Plaintiffs*, <br><br> v. <br><br> STEVE SIMON, in his official capacity as Secretary of State of Minnesota, *Defendant*, <br><br> DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE, and REPUBLICAN PARTY OF MINNESOTA, *[Proposed] Intervenor-Defendants*. | Case No. 0:20-cv-01205-ECT-TNL |

## [PROPOSED] INTERVENOR-DEFENDANTS' OPPOSITION TO THE PROPOSED CONSENT DECREE

# TABLE OF CONTENTS

Background ...........................................................................................................1

Legal Standard....................................................................................................6

Argument .............................................................................................................7

    I.     The consent decree should be rejected because Plaintiffs identified no probable violation of federal law. .......................................................7

        A.     Under the *Purcell* principle, Plaintiffs could not obtain a preliminary injunction for the August primary.......................................9

        B.     Under basic equitable principles, Plaintiffs could not obtain a preliminary injunction for the November election. ............................ 12

        C.     Plaintiffs could not show that the challenged laws are unconstitutional. ...................................................................... 14

            i.     The witness requirement doesn't burden voting rights because there is no constitutional right to vote absentee. ...... 16

            ii.    Even if the witness requirement affected voting rights, it easily satisfies the *Anderson-Burdick* test..................................... 20

    II.    The consent decree should be rejected because it does not reflect arm's-length negotiations and gives a windfall to Plaintiffs. .................................... 25

    III.   The consent decree should be rejected because it unreasonably injures other parties. .................................................................................. 31

Conclusion........................................................................................................... 35

Intervenors are "entitled to present evidence and have [their] objections heard at the hearings on whether to approve a consent decree." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986). Proposed Intervenor-Defendants—Donald J. Trump for President, Inc., the Republican National Committee, and the Republican Party of Minnesota—thus submit this opposition "to air [their] objections to the reasonableness of the decree and to introduce relevant evidence" and arguments that the parties won't. *Id.* This Court should grant their motion to intervene and reject the parties' proposed consent decree.

## BACKGROUND

COVID-19 has sparked an unprecedented number of lawsuits that attempt to invalidate or suspend routine election laws. *2020 Was Already Expected to Be a Record Year for Election-Related Lawsuits—Then Coronavirus Happened*, Newsweek (Apr. 23, 2020), bit.ly/2zMKVOl. Democrats sought similar reforms long before COVID-19— expanded mail-in voting, no voter-ID requirements, unlimited ballot harvesting, and the like. But even in the wake of COVID-19, Democrats were unable to persuade Congress or the Minnesota Legislature to adopt their legislative agenda. *A DFL Push to Move Minnesota to Entirely Vote-By-Mail Is Complicating Bipartisan Efforts Around Other COVID-Related Election Changes*, Minn. Post (Apr. 27, 2020), bit.ly/3ekHNIr (*DFL Push*). So they turned to the courts.

Democrats now contend that, in light of COVID-19, their legislative agenda is *required* by the Constitution. The Democratic Party (through its law firm, Perkins Coie) has filed COVID-19 lawsuits in virtually every swing State, including Minnesota. *See Where We're Litigating*, Democracy Docket, bit.ly/2V0rF7k. Allied groups have bolstered the Democrats' effort by filing dozens of copycat suits across the country. For example, the League of Women Voters brought this suit in federal court, while the Alliance for Retired Americans (backed by the Democratic Party) and the NAACP (backed by the ACLU) brought overlapping lawsuits in state court. *See Trio of Lawsuits Challenge Minnesota Absentee Balloting Requirements Amid COVID-19*, Minn. Post (June 12, 2020), bit.ly/3fGXwSt.

When these COVID-19 lawsuits face adversarial litigation, they usually fail. Wisconsin is the first and most prominent example. Three weeks before the April 7 primary, Democrats challenged several Wisconsin laws, including the requirement that voters obtain a witness's signature for their absentee ballot—a voter-ID requirement that Wisconsin enacted to deter fraud and promote election integrity. Democrats argued that COVID-19 made this requirement too dangerous because, to find a witness, voters who lived alone "would have to interact with a non-household member to secure a signature, … placing their health in jeopardy." *Democratic Nat'l Comm. v. Bostelmann*, Doc. 62 at 13, No. 3:20-cv-249-wmc (W.D. Wis. Mar. 27, 2020); *see also id.* at 22 ("[The challenged laws] encourage determined registrants and voters to venture out into the world and interact face-to-face with people, … exposing

Wisconsinites to an ailment that has already claimed thousands of lives internationally."). The district court agreed, contending that the "hurdles" associated with finding a witness during COVID-19 "are not overcome by the state's general anti-fraud goals." *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1638374, at *20 (W.D. Wis. Apr. 2, 2020) (*DNC I*). It preliminarily enjoined the witness requirement for voters who certified that, despite reasonable efforts, they could not safely find a witness. *See id.*

The district court was swiftly reversed. On appeal, the Seventh Circuit stayed the part of the injunction that suspended the witness requirement. *See Democratic Nat'l Comm. v. Bostelmann*, Doc. 30, No. 20-1538 (7th Cir. Apr. 3, 2020) (*DNC II*). The Seventh Circuit stressed that the district court gave short shrift to "the state's substantial interest in combatting voter fraud." *Id.* at 3. On further appeal, the U.S. Supreme Court stayed more of the district court's decision. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (*RNC*). The Court relied exclusively on "the *Purcell* principle"—the doctrine that courts in equity "should ordinarily not alter the election rules on the eve of an election." *Id.* at 1207.

More recently, the Fifth and Sixth Circuits have also stayed district-court decisions enjoining election laws in light of COVID-19. *See Thompson v. Dewine*, 959 F.3d 804 (6th Cir. 2020); *Tex. Democratic Party v. Abbott*, 2020 WL 2982937 (5th Cir. June 4, 2020). And the Eighth Circuit administratively stayed a district-court decision enjoining a witness requirement in light of COVID-19. *See Miller v. Thurston*, Text

Order, No. 20-2095 (8th Cir. June 15, 2020). The Eleventh Circuit is likewise considering an emergency stay application in a similar case. *See People First of Ala. v. Ala. Sec'y of State*, No. 20-12184.[1]

Plaintiffs filed this action on May 19, 2020, seeking to enjoin Minnesota's witness requirement, Minn. Stat. §§203B.07, 204B.45. Doc. 1 at 27-29. In their complaint, Plaintiffs acknowledged Minnesota's "legitimate interest in preventing fraud and the appearance of fraud in elections." Doc. 1 ¶62. Further, they acknowledged that the witness requirement is reasonable and lawful under normal circumstances, challenging it only as applied to elections conducted during the COVID-19 pandemic. *See* Doc. 1 ¶¶95, 97.

On May 29, Plaintiffs moved to preliminarily enjoin the witness requirement for both the August primary and the November general election. Doc. 13. Plaintiffs argued that the witness requirement, as applied to elections during the COVID-19 pandemic, violates the constitutional right to vote. Doc. 15. They sought sweeping injunctive relief that would require Defendant to do four things: (1) refrain from enforcing the witness requirement; (2) instruct local officials that no absentee ballot could be rejected for lack of compliance with the witness requirement; (3) take steps

---

[1] Without the benefit of the Fifth and Sixth Circuits' rulings, a district court in Virginia approved a consent decree similar to the one at issue here. *League of Women Voters of Va. v. Va. State Bd. of Elections*, 2020 WL 2158249 (W.D. Va. May 5, 2020). As will become clear later, Proposed Intervenor-Defendants disagree with that decision. This Court should not repeat its many errors.

to ensure that the instructions accompanying absentee ballots do not direct voters to comply with the witness requirement; and (4) inform the public that the witness requirement will not be enforced for the August primary and November general elections. Doc. 13 at 1-2.

Defendant filed an answer on June 9, 2020. Doc. 22. In it, he denied all Plaintiffs' material allegations. Doc. 22 ¶¶7, 12, 62, 65, 80, 81, 87, 95, 100, 102, 109, 111. He also denied that heightened scrutiny applied to the witness requirement and argued that the requirement would survive any level of judicial scrutiny. Doc. 22 ¶¶106, 107. And he asserted that Plaintiffs failed to state a claim upon which relief could be granted. Doc. 22 at 40.

At some point in the next seven days, Defendant made a sharp U-turn. On June 16, the parties jointly submitted a proposed consent decree to the Court. Under that decree, Defendant would totally refrain from enforcing the witness requirement and concede to all four kinds of relief that Plaintiffs sought for the August primary. Doc. 24 at 6.[2] Further, Defendant would concede that "Plaintiffs made a sufficiently strong showing on the merits of the claim"—a position directly contrary to the one he took in his answer a week earlier. Doc. 24 ¶20. In return for his total capitulation to Plaintiffs' demands, Defendant obtained little, if anything. Although the decree does

---

[2] Given its general scope, the relief in the proposed consent decree resembles a successful facial challenge. While Plaintiffs have identified a temporal limitation on the scope of the proposed relief, limiting it to the August 2020 primary, they have *not* limited the relief to any particular voters or any clearly ascertainable class of voters.

not address the November election, Defendant agreed to let Plaintiffs withdraw their preliminary-injunction motion "without prejudice" so they could refile it again for November. Doc. 24 at 6. In other words, Plaintiffs got everything and took nothing off the table.

Seeing that the proposed consent decree disserved Minnesotans, Proposed Intervenor-Defendants promptly moved to enter this case. Doc. 29. The Court reset the hearing on the proposed consent decree, and ordered Proposed Intervenor-Defendants to file their intervention papers and their opposition to the consent decree by 5:00 p.m. today. Doc. 33. The fairness hearing on the proposed consent decree is set for Tuesday. Doc. 33.

## LEGAL STANDARD

Because a consent decree is a "judgment" of this Court, it cannot be entered without the Court's "examin[ation]" and "approval." *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 280 (4th Cir. 2002). As this Court has explained, approving a consent decree "requires careful court scrutiny," not a "mechanistic[] 'rubber stamp.'" Doc. 26 at 1 (quoting *Ibarra v. Texas Emp't Comm'n*, 823 F.2d 873, 878 (5th Cir. 1987); and *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir. 2002)). After all, "a federal court is more than 'a recorder of contracts' from whom parties can purchase injunctions." *Local No. 93*, 478 U.S. at 525. It is "'an organ of government constituted to make judicial decisions,'" and it cannot "lend the aid of the federal court to whatever strikes two parties' fancy." *Id.*; *Kasper v. Bd. of Election Comm'rs of the City of*

*Chi.*, 814 F.2d 332, 338 (7th Cir. 1987). Instead, every consent decree must be "examine[d] carefully" to ensure that its terms are "fair, adequate, and reasonable." *United States v. City of Miami*, 664 F.2d 435, 440-41 (5th Cir. 1981) (en banc) (Rubin, J., concurring). The court also "must ensure that the agreement is not illegal, a product of collusion, or against the public interest." *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991).

## ARGUMENT

The parties' proposed consent decree is neither fair nor reasonable nor legal. It suspends a perfectly constitutional law that Plaintiffs had no hope of enjoining. It appears to be, not an arm's-length deal between adversaries, but a sweetheart deal that gives Plaintiffs everything and Minnesotans nothing. And it unreasonably injures the rights and interests of third parties, including Proposed Intervenor-Defendants and their members. This Court should reject it.

## I. The consent decree should be rejected because Plaintiffs identified no probable violation of federal law.

When deciding whether to approve or reject the consent decree, this Court rightly acknowledged that it "must 'consider the underlying facts and legal arguments' that support or undermine the proposal." Doc. 26 at 1 (quoting *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir. 2002)). While courts needn't conduct a full-blown trial, they must "reach 'an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'" *Flinn*, 528 F.2d at

1173. This Court must determine Plaintiffs' likelihood of success on the merits here for two reasons.

One, the proposed consent decree suspends Minnesota's witness requirement—a duly enacted state law. *See* Doc. 24 at 6. "A consent decree is not a method by which state agencies may liberate themselves from the statutes enacted by the legislature that created them." *Kasper*, 814 F.2d at 341-42. A "consent judgment in which the executive branch of a state consents not to enforce a law is 'void on its face,'" unless the approving court finds "a probable violation of [federal] law." *Id.* at 342. A federal judge cannot "'put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence.'" Doc. 26 at 1-2 (quoting *City of Miami*, 664 F.2d at 441).

Two, the merits are "[t]he most important factor" in determining whether the consent decree is fair, adequate, and reasonable, since these factors can be examined "'only in light of the strength of the case presented by the plaintiffs.'" *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir. 1975). Courts can gauge "the fairness of a proposed compromise" by "weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). A decree that takes plaintiffs with flimsy claims, gives them most of what they asked for, and gets nothing in return is not fair or reasonable.

Here, the proposed consent decree strikes the following deal: Minnesota will fully suspend its witness requirement for all voters in the August primary, issue

guidance explaining this change to local election officials, and notify all voters of this change. Plaintiffs will withdraw their motion for a preliminary injunction (which asked the Court to suspend the witness requirement for both the August and November elections)—but without prejudice to their ability to bring a similar motion later. *See* Doc. 24 at 6. In other words, Plaintiffs got everything they wanted for the August primary and gave up nothing going forward. Quite obviously, that is not a good deal for Minnesotans. For several reasons—all of which have been accepted by the majority of courts to consider these COVID-19/election cases—Plaintiffs had virtually no chance of winning their preliminary-injunction motion or obtaining this kind of relief.

> **A.    Under the *Purcell* principle, Plaintiffs could not obtain a preliminary injunction for the August primary.**

Plaintiffs filed this lawsuit on May 19, three months before the August 11 primary and two months before the commencement of absentee voting. Their preliminary-injunction motion would not have been heard until a month later. *See* Doc. 18 (setting the hearing for June 10). And now, voting is less than a week away, with early and absentee voting beginning on June 26. *See* Doc. 24 ¶11. If Defendant had contested Plaintiffs' right to injunctive relief for the August primary, Defendant would have easily defeated it under the *Purcell* principle.

Under *Purcell*, "federal courts are not supposed to change state election rules as elections approach." *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020). Invoking

this strong principle of non-interference, the Supreme Court routinely stays lower-court orders requiring States to change election laws shortly before elections. In other words, the Court "allow[s] the election to proceed without an injunction suspending [election] rules." *Purcell*, 549 U.S. at 6. This practice is longstanding. *See, e.g., Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968) (denying relief because it would cause "serious disruption of [the] election process" and "confusion" for voters). And it has been invoked in several cases where the amount of time between the court's order and key election deadlines resembles the timeline here. *See, e.g., Husted v. Ohio State Conference of NAACP*, 573 U.S. 988 (2014) (staying a lower-court order that changed election laws 61 days before election day); *Thompson*, 959 F.3d at 813 (election day was "months away but important, interim deadlines … [we]re imminent"); *Perry v. Perez*, 565 U.S. 1090 (2011) (22 days before the candidate-registration deadline); *Purcell*, 549 U.S. at 4-5 (33 days before election day); *North Carolina v. League of Women Voters of N.C.*, 574 U.S. 927 (2014) (32 days before election day).

The *Purcell* principle ensures that voters, candidates, and political parties know and adhere to the same neutral rules throughout the election process. As *Purcell* explains, this stability and predictability promotes "[c]onfidence in the integrity of our electoral process," which "is essential to the functioning of our participatory democracy." 549 U.S. at 4. Conversely, courts risk "voter confusion" when they order late-breaking changes to election laws. *Id.* at 4-5. "As an election draws closer, that risk will increase." *Id.* at 5. Voter confusion, in turn, causes a "consequent incentive to

remain away from the polls." *Id.* In other words, last-minute "interference by the judicial department with the electoral franchise of the people of this state … might well amount to a substantial destruction of that most important civil right." *Beebe v. Koontz*, 302 P.2d 486, 490 (Nev. 1956).

*Purcell* doesn't care if "Plaintiffs made a sufficiently strong showing on the merits." Doc. 24 ¶20. The *Purcell* principle is a *sufficient* basis to deny injunctive relief— one that must be invoked even if Plaintiff's claims are concededly meritorious. *See Purcell*, 549 U.S. at 5 (vacating a lower court's injunction "[g]iven the imminence of the election" while "express[ing] no opinion here on the correct disposition" of the case); *Short v. Brown*, 893 F.3d 671, 680 (9th Cir. 2018) ("[E]ven if the merits question were close, the district court did not abuse its discretion [by denying a preliminary injunction on *Purcell* grounds]"). "[T]iming … rather than the[] merits" is "the key" to *Purcell. Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014).

In Wisconsin, for example, the Supreme Court stayed the district court's coronavirus-inspired injunction based solely on *Purcell*, declining to "express[] an opinion" on the merits of the case. *RNC*, 140 S. Ct. at 1206-08. The Court rejected the Democrats' argument that, because "'the electoral *status quo*' *already* has been upended … by the COVID-19 pandemic," *Purcell* has no application in 2020. Resp'ts Br. 16, bit.ly/2AKc1Gt. Even in the face of COVID-19, then, *Purcell* applies with full force. *See Thompson*, 959 F.3d at 813.

This Court—if given the chance—would have followed *RNC* and likely denied Plaintiffs' motion for a preliminary injunction. Whatever the merits of their claims, the *Purcell* principle would have prohibited the grant of any injunctive relief for the August primary.[3]

### B.     Under basic equitable principles, Plaintiffs could not obtain a preliminary injunction for the November election.

Plaintiffs asked for a preliminary injunction that would last "for the duration of calendar year 2020." Doc. 13 at 1. In other words, they wanted the witness requirement suspended for the November election as well. But this Court would not have granted relief for the November election *in June. See People First of Ala. v. Merrill*, 2020 WL 3207824, at *5 (N.D. Ala. June 15, 2020) (holding, in a COVID-19/election case, that "it is premature for the court to consider a preliminary injunction for the elections in August and November").

To obtain a preliminary injunction (or any equitable relief, really), Plaintiffs must show "irreparable harm." *Regions Treatment Ctr., LLC v. New Stream Real Estate, LLC*, 2013 WL 4028148, at *2 (D. Minn. Aug. 7, 2013) (citing *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)). That showing "requires more than a possibility of remote future injury." *Id.* (citing *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th

---

[3] The court in the Virginia case similar to this one did not explain how, less than two months before the June primary, *Purcell* would have allowed the plaintiffs to secure a preliminary injunction. *See League of Women Voters of Va.*, 2020 WL 2158249, at *3-4. That is the question the court should have asked because, like this case, the preliminary-injunction motion was all that plaintiffs offered to withdraw in exchange for the consent decree. *Id.* at *4.

Cir. 1982)). It "requires a presently existing actual threat of injury"; "'[w]holly speculative' harm will not" do. *Id.* (quoting *Local Union No. 884, United Rubber Workers v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995)). More specifically, Plaintiffs cannot obtain a preliminary injunction unless their irreparable harm "'is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011).

Yet Plaintiffs have no idea whether, and to what extent, COVID-19 will remain a threat in November—let alone what effect it will have on voters' ability to find a witness. No one does. Plaintiffs' only evidence on this question came from their expert, who admits that the coronavirus is "novel," that he "cannot say definitively whether its incidence and prevalence will rise and fall based on weather or season," and that "it is difficult to predict whether and when the incidence and prevalence of SARS-CoV-2 infection will fluctuate." Doc. 15-5 ¶¶17-18.

Indeed, Plaintiffs' claim for injunctive relief rests on a litany of speculative, unknowable assumptions. It assumes that COVID-19 will resurge in November. That it will resurge to a degree that makes finding a witness or voting in person unreasonably dangerous (even with increased social distancing and sanitization). That Minnesota will make no adjustments to improve safety. That no vaccine will be created. That no herd immunity will develop. And much more. As another court in this Circuit put it, harms that stem from "potentially contracting COVID-19," "the

spread of COVID-19," or the "[inability] to contain it" are simply "too speculative under Eighth Circuit precedent" to warrant a preliminary injunction. *Rural Cmty. Workers All. v. Smithfield Foods, Inc.*, 2020 WL 2145350, at \*9-10 (W.D. Mo. May 5, 2020).[4]

In short, this Court would have denied Plaintiffs' motion as applied to the November election because it was overly speculative and premature. The Court could have "declined to exercise its equitable jurisdiction upon these grounds alone." *Mo. Pac. Transp. Co. v. Priest*, 117 F.2d 32, 34 (8th Cir. 1941). Doing so would have honored the Supreme Court's observation that, "[e]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Eccles v. Peoples Bank of Lakewood Vill.*, 333 U.S. 426, 431 (1948).

## C. Plaintiffs could not show that the challenged laws are unconstitutional.

Even assuming Plaintiffs satisfied the requirements for injunctive relief, their constitutional claims would fail on the merits. Plaintiffs pressed only one claim in their preliminary-injunction motion: that Minnesota's witness requirement violates the

---

[4] Plaintiffs cannot sidestep this problem by arguing that, "regardless of the precise infection rate [in November]," voters' *fears* of contracting COVID-19 will still "deter [them] from meeting with witnesses." Doc. 15 at 31. Even if speculative fears somehow counted as a burden imposed by the State, these predictions about what voters will think or feel in November are equally too "speculative" to support a preliminary injunction. *Shaw v. Kaemingk*, 2019 WL 6465339, at \*2 (D.S.D. Dec. 2, 2019).

constitutional right to vote. As Plaintiffs acknowledge, burdens on voting rights are subject to the balancing test from the Supreme Court's decisions in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).

Under the *Anderson-Burdick* test, States can conduct "*substantial* regulation of elections." *Burdick*, 504 U.S. at 432 (emphasis added). *Anderson-Burdick* is a "flexible standard" that "reject[s] the contention that any law imposing a burden" on constitutional rights "is subject to strict scrutiny." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009); *Nevadans for the Prot. of Prop. Rights, Inc. v. Heller*, 141 P.3d 1235, 1241 (Nev. 2006). Every election law "is going to exclude, either de jure or de facto, some people" from exercising their rights; "the constitutional question is whether the restriction and resulting exclusion are *reasonable* given the interest the restriction serves." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (emphasis added).

*Anderson-Burdick* requires Plaintiffs to satisfy a two-step inquiry, imposing a heavy burden at each step. First, Plaintiffs must prove that the challenged laws inflict a cognizable burden on their rights and quantify the severity of that burden. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Common Cause/Ga.*, 554 F.3d at 1354. Second, Plaintiffs must show that the burden outweighs the State's interests. *Timmons*, 520 U.S. at 358. Only when an election law "subject[s]" voting rights "to 'severe' restrictions" does a court apply strict scrutiny and assess whether the law "'is narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504

U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). Mine-run election laws that "impose[] only 'reasonable, nondiscriminatory restrictions'" are "'generally'" justified by "'the State's important regulatory interests.'" *Burdick*, 504 U.S. at 433. After all, there is no constitutional right to be free from "the usual burdens of voting." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (op. of Stevens, J.).

Minnesota's witness requirement does not implicate the right to vote at all. Even if it did, it easily satisfies *Anderson-Burdick*. Before, during, or after COVID-19, the law imposes only routine burdens that are amply justified by the State's important interests in deterring fraud and promoting voters' confidence in the integrity of Minnesota elections.

### i. The witness requirement doesn't burden voting rights because there is no constitutional right to vote absentee.

The witness requirement governs only *absentee* voting. If voters cannot find a witness, they can still vote in-person on election day or during the 46-day early voting period. *See* Doc. 15 at 10. Because in-person voting remains available, unburdened by the witness requirement, "the right to vote is not 'at stake'" here. *Tex. Democratic Party*, 2020 WL 2982937, at *10 (quoting *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969)).

The Constitution guarantees *one* viable method of voting. And "there is no constitutional right to an absentee ballot." *Mays*, 951 F.3d at 792; *accord Griffin*, 385

F.3d at 1130. When States impose some limitation on absentee voting, but not in-person voting, "[i]t is … not the right to vote that is at stake … but a claimed right to receive absentee ballots"—which is not a constitutional right at all. *McDonald*, 394 U.S. at 807. As the Fifth Circuit recently explained in a COVID-19 case, the Constitution is not violated "unless … the state has 'in fact absolutely prohibited' the plaintiff from voting," and "permit[ting] the plaintiffs to vote in person … is the exact opposite of 'absolutely prohibit[ing]' them from doing so." *Tex. Democratic Party*, 2020 WL 2982937, at *10.

While Plaintiffs insist that in-person voting is too difficult or dangerous during COVID-19, that rejoinder fails for at least two reasons.

***First***, "[constitutional] violations require state action," and Minnesota is not responsible for COVID-19 or private citizens' responses to it. *Thompson*, 959 F.3d at 810. While COVID-19 has dramatically changed Minnesotans' everyday lives, these difficulties are not burdens imposed "*by the State.*" *Tex. Democratic Party*, 2020 WL 2982937, at *10 (quoting *McDonald*, 394 U.S. at 808 n.7). These obstacles to voting "are not caused by or fairly traceable to the actions of the State, but rather are caused by the global pandemic." *Mays v. Thurston*, 2020 WL 1531359, at *2 (E.D. Ark. Mar. 30, 2020). To date, most courts have recognized that "COVID-19 … is not the result of any act or failure to act by the Government. And that fact is important" because "[a]ll of the election cases cited by Plaintiffs in which injunctive relief was granted involved a burden … that was created by the Government. Not so here." *Coalition for*

*Good Governance v. Raffensperger*, 2020 WL 2509092, at *3 n.2 (N.D. Ga. May 14, 2020); *accord Tex. Democratic Party*, 2020 WL 2982937, at *11 ("The Constitution is not offended … even where voting in person may be extremely difficult … because of circumstances beyond the state's control, such as the presence of the Virus." (cleaned up)).

**Second**, even if Plaintiffs' think otherwise, *the State* has determined that in-person voting can be done safely and effectively. The Minnesota Legislature considered and rejected plans to cancel in-person voting and to adopt all-mail elections, opting instead to make in-person voting easier and safer. *See DFL Push, supra*. The Governor likewise exempted voting from his stay-at-home order; and the Secretary of State has issued guidance on "social distancing …, equipment sanitization, and hygiene for polling places," and has made "[c]urbside voting available for anyone who cannot enter the polling place for any reason, including concerns for their health." *2012 Elections and COVID-19*, Minn. Sec'y of State, bit.ly/3hJtq2s. Meanwhile, Minnesota has moved into "Phase III" of its reopening plan, deeming it safe for Minnesotans (with social-distancing precautions) to go to stores, gyms, salons, restaurants, bars, swimming pools, daycare, school, and church, and to attend indoor gatherings of up to 10 people. *See Safely Reopening Minnesota*, Stay Safe MN, staysafe.mn.gov (*Safely Reopening*).

Federal courts cannot and should not second-guess the judgment of Minnesota's election officials that in-person voting can be done safely and effectively.

As the Seventh Circuit explained in Wisconsin, questions about how to "accommodate voters' interests while also striving to ensure their safety" are best left to election officials, who are "better positioned … to accommodate the many intersecting interests in play in the present circumstances." *DNC II*, *supra*. "[F]ederal courts make poor arbiters of public health." *Sinner v. Jaeger*, 2020 WL 3244143, at *6 (D.N.D. June 15, 2020). They do "not have the authority 'to act as the state's chief health official' by making the decision" how best to protect "the health and safety of the community." *Taylor v. Milwaukee Election Comm'n*, 2020 WL 1695454, at *9 (E.D. Wis. Apr. 6, 2020). These "decisions are instead best left 'to the politically accountable officials of the States,' not 'an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people.'" *Sinner*, 2020 WL 3244143, at *6 (quoting *S. Bay United Pentecostal Church v. Newsom*, 2020 WL 2813056, at *1 (U.S. May 29, 2020) (Roberts, C.J., concurring in the denial of injunctive relief)).[5]

In short, this Court would likely accept Minnesota's considered judgment that in-person voting is safe and available. That finding would, in turn, entirely defeat Plaintiffs' right-to-vote claim.

---

[5] The court in Virginia simply bypassed this issue. It assumed that restrictions on absentee voting implicate the constitutional right to vote, without considering whether in-person voting remained available or whether the State had deemed it safe. *See League of Women Voters of Va.*, 2020 WL 2158249, at *7.

### ii.  Even if the witness requirement affected voting rights, it easily satisfies the *Anderson-Burdick* test.

The witness requirement would satisfy *Anderson-Burdick* review even accepting the implausible premise that COVID-19 gives Plaintiffs a constitutional right to vote by mail. Plaintiffs agree that the witness requirement satisfies *Anderson-Burdick* in normal times. *See* Doc. 15 at 14 (arguing only that "the witness requirement is unconstitutional as applied in this unique situation"); *id.* at 28 (conceding that "under normal circumstances most Minnesotans may be able to find an eligible individual to witness their absentee ballot"). So the question is whether COVID-19 somehow *made* the witness requirement unconstitutional. Setting aside obvious state-action problems, the answer is no. The witness requirement remains a minimal burden on voters that is justified by the State's "'important regulatory interests.'" *Burdick*, 504 U.S. at 433.

**Burden on Voters**: On the individual side of the *Anderson-Burdick* balance, Plaintiffs must introduce "evidence" to "quantify the magnitude of the burden" from the challenged laws. *Crawford*, 553 U.S. at 200. "[T]he extent of the burden … is a factual question on which the [plaintiff] bears the burden of proof," *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1124 (9th Cir. 2016), and the plaintiff must "direct th[e] Court to … admissible and reliable evidence that quantifies the extent and scope of the burden." *Common Cause/Ga.*, 554 F.3d at 1354.

That evidence doesn't exist. If "the inconvenience of making a trip to the [D]MV, gathering the required documents, and posing for a photograph surely does

not qualify as a substantial burden on the right to vote," *Crawford*, 553 U.S. at 198, then neither does finding a qualified person to witness an absentee ballot. It is no more dangerous than other activities that the State deems safe, like going to the grocery store or having 9 friends over for a visit. *See Safely Reopening*, *supra*. And "[t]here's no reason" why the witnessing process cannot be done "within the bounds of our current situation"—for example, by "witnessing the signatures from a safe distance," staying outdoors, wearing a mask, standing behind glass, or practicing good hygiene. *Thompson*, 959 F.3d at 810. While these workarounds might be "harder" (as are many tasks during a pandemic), *id.*, inconveniences are not "severe" burdens that trigger strict scrutiny, *Crawford*, 553 U.S. at 198.

Doubtful, but perhaps there is some tiny, idiosyncratic group of voters who, despite "reasonable effort," cannot find a witness and cannot take advantage of Minnesota's 46-day early-voting period or its numerous methods for voting in person. *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) (*Frank II*). If that is what Plaintiffs' case turns on, "[z]eroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016). Evidence that a law uniquely burdens one particular group does not justify enjoining the statute as to all voters. Rather, requests for facial, statewide relief—like Plaintiffs make here and the State is prepared to give away in the consent decree—fail when the challenged law "has a plainly legitimate sweep." *Crawford*, 553 U.S. at 202-03; *see id.* at 206 (Scalia, J., concurring in judgment)

(when assessing a burden's severity, courts must look at the burden's impact "categorically" upon all voters, without "consider[ing] the peculiar circumstances of individual voters"). The "burden some voters face[]" from a challenged law cannot "prevent the state from applying the law generally." *Frank II*, 819 F.3d at 386. Those claims must be vindicated in as-applied challenges that seek relief for "those particular persons." *Id.*

**Interests of the State**: Because the witness requirement imposes little to no burden on voters, Minnesota's "'important regulatory interests'" more than justify it. *Burdick*, 504 U.S. at 433. Witness requirements for absentee ballots, as the Seventh Circuit explained in Wisconsin, serve the State's "substantial interest in combatting voter fraud." *DNC II*, *supra*; *accord Thompson*, 959 F.3d at 811 ("witness … requirements help prevent fraud"). By requiring "in-person" verification, witness requirements serve the "unquestionably important interests" of "preventing fraud and protecting the integrity of the electoral process." *Sinner*, 2020 WL 3244143, at *7. "These interests are not only legitimate, they are compelling." *Thompson*, 959 F.3d at 811.

It is no answer to say that Minnesota has other methods to deter fraud, like criminal penalties. *See* Doc. 15 at 21-22. Minnesota does not have to satisfy strict scrutiny here or prove narrow tailoring. *See Burdick*, 504 U.S. at 434. Under *Anderson-Burdick*'s intermediate balancing test, States can supplement post-hoc punishments with measures aimed at "prophylactically preventing fraud." *Sinner*, 2020 WL 3244143,

at *7; *see Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) ("Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively.").

It is also no answer to say that absentee-voting fraud is "rare." Doc. 15 at 2. It's not rare enough. *See infra* III. And "voter fraud" is notoriously "difficult to detect and prosecute." *Tex. Democratic Party*, 2020 WL 2982937, at *3. The whole reason it's rare, moreover, is precisely *because* States have integrity measures like the witness requirement in place.

Regardless, *Anderson-Burdick* treats the State's interest as a "legislative fact," accepted as true so long as it's reasonable. *Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014) (*Frank I*). States are not required to submit "any record evidence in support of [their] stated interests." *Common Cause/Ga.*, 554 F.3d at 1353; *accord ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1323 (10th Cir. 2008) (city need not "present evidence of past instances of voting fraud"). In fact, when responding to an *Anderson-Burdick* challenge, States can rely on "post hoc rationalizations," can "come up with its justifications at any time," and have no "limit[s]" on the type of "record [they] can build in order to justify a burden placed on the right to vote." *Mays v. LaRose*, 951 F.3d 775, 789 (6th Cir. 2020). States can rely on examples from other jurisdictions, court decisions, general history, or sheer logic. *Common Cause/Ga.*, 554 F.3d at 1353; *Frank I*, 768 F.3d at 750. In *Crawford*, for example, the Supreme Court found Indiana's interest in preventing in-person voter fraud compelling even though "[t]he record

contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history." 553 U.S. at 194.

"[T]here is no suggestion that these widely held concerns about voter fraud will not be present during the pandemic"; to the contrary, COVID-19 makes Minnesota's interest *heightened*, as record numbers of voters submit absentee ballots while the State's resources are already stretched thin. *Tex. Democratic Party*, 2020 WL 2982937, at *19 (Ho, J., concurring); *see* @MNSteveSimon, Twitter (June 19, 2020), [bit.ly/2V3Hp9z](bit.ly/2V3Hp9z) (reporting that Minnesotans have requested 25 times as many absentee ballots as previous years). States should receive more leeway under *Anderson-Burdick*, not less, when dealing with emergencies that affect election. These crises give the State new "important interests" like "focus[ing] their resources on recovering from the emergency, ensuring the accuracy of [electoral records] they have received, … and otherwise minimizing the likelihood of errors or delays in voting." Morley, *Election Emergencies: Voting in the Wake of Natural Disasters and Terrorist Attacks*, 67 Emory L.J. 545, 593 (2018).

An "election emergency" should thus "seldom warrant" changes to election laws by judicial fiat. *Id.*; *see, e.g.*, *Williams v. DeSantis*, Doc. 12, No. 1:20-cv-67 (N.D. Fla. Mar. 17, 2020) (declining to intervene in Florida's primary election in the face of COVID-19); *Bethea v. Deal*, 2016 WL 6123241, at *2-3 (S.D. Ga. Oct. 19, 2016) (declining to extend Georgia's voter-registration deadline in the wake of Hurricane Matthew); Doc. 58, *ACORN v. Blanco*, No. 2:06-cv-611 (E.D. La. Apr. 21, 2006)

(denying request to extend the deadline for counting absentee ballots received by mail in New Orleans in the wake of Hurricane Katrina). This Court would likely reach the same conclusion here.

Because Plaintiffs were never entitled to an injunction and identified no violation of federal law, the proposed consent decree is a raw deal for Minnesotans. Not only that, but it requires this Court to sanction violations of a valid state law. The decree is thus "'void on its face'" and should be rejected. *Kasper*, 814 F.2d at 342.

## II.   The consent decree should be rejected because it does not reflect arm's-length negotiations and gives a windfall to Plaintiffs.

Consent decrees must be not only substantively sound, but also procedurally fair. Procedural fairness is evaluated "from the standpoint of [both] signatories and nonparties to the decree." *United States v. Akzo Coatings of Am., Inc.,* 949 F.2d 1409, 1435 (6th Cir. 1991). Consent decrees are fair when they flow from negotiations "filled with 'adversarial vigor.'" *City of Waterloo*, 2016 WL 254725, at *4. The parties must "negotiat[e] in good faith and at arm's length." *BP Amoco Oil*, 277 F.3d at 1020. Agreements that lack adversarial vigor become "collusive," and are, by definition, not fair. *Colorado*, 937 F.2d 509.

In fact, a consent decree between non-adverse parties "is no judgment of the court. It is a nullity." *Lord v. Veazie*, 49 U.S. 251, 256 (1850). This rule stems from the fundamental constitutional requirement that parties be concretely adversarial before an Article III court can act on their claims. There is "no case or controversy within

the meaning of Article III of the Constitution" when "both litigants desire precisely the same result." *Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 47-48 (1971). Put differently, a collusive suit lacks "the 'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of the constitutional questions by the Court." *United States v. Johnson*, 319 U.S. 302, 305 (1943).

Regrettably, "it is not uncommon for consent decrees to be entered into on terms favorable to those challenging governmental action because of rifts within the bureaucracy or between the executive and legislative branches." *Ragsdale v. Turnock*, 941 F.2d 501, 517 (7th Cir. 1991) (Flaum, J., concurring in part and dissenting in part); *accord* Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions,* 1983 Duke L.J. 1265, 1292, 1294-95 (1983) (discussing phenomenon of "[n]ominal defendants [who] are sometimes happy to be sued and happier still to lose"); Easterbrook, *Justice and Contract in Consent Judgments,* 1987 U. Chi. L. Forum 19, 30-37 (1987). That is why courts should look skeptically at consent decrees used to enact or modify governmental policy. Otherwise, non-adverse parties can employ consent decrees to "sidestep political constraints" and obtain relief otherwise unavailable through the political process. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change,* 1987 U. Chi. Legal F. 295, 317. In particular, "district judges should be on the lookout for attempts to use consent decrees to make end runs around the legislature." *Kasper*, 814 F.2d at 340;

*see Dunn v. Carey,* 808 F.2d 555, 560 (7th Cir. 1986) ("A court must be alert to the possibility that a consent decree is a ploy in some other struggle.").

These opportunities and incentives are present here. Given that Defendant recently failed to convince the legislature to relax absentee-voting rules, *see Minnesota Waives Absentee Ballot Witness Signature Mandate*, U.S. News & World Report (June 17, 2020), bit.ly/3dl5tek, the proposed consent decree helps achieve an "end run[] around the legislature." *Kasper*, 814 F.2d at 340. Defendant is also a member of the League of Women Voters. *See Steve Simon's Biography*, Vote Smart, bit.ly/3ejEP6R. And his attorney was recently Deputy Chair of the Democratic Party. *See* Hayes, *DNC's Second in Command Steps Down After Winning Attorney General Race in Minnesota,* USA Today (Nov. 8, 2018), bit.ly/316q8k9. The Democratic Party, of course, is backing a similar lawsuit in state court and just negotiated a very similar consent decree with Defendant over the same timeframe. *See* Doc. 28. No doubt, these groups believe they are doing a good thing by using lawsuits to "revamp [the] electoral system," *see Eric Holder: Here's How the Coronavirus Crisis Should Change U.S. Elections—For Good*, TIME (Apr. 14, 2020), bit.ly/3fJsjhk, and to "gain …vote[s]" for Democrats, @marcelias, Twitter (May 3, 2020), bit.ly/2XiI74A. But their lack of adversarialness disserves the public and undermines the proposed consent decree. *See North Carolina*, 180 F.3d at 581; *Colorado*, 937 F.2d at 509.

More to the point, the sequence of events here is inconsistent with arm's-length negotiations. Plaintiffs filed their complaint one month ago yesterday. Doc. 1 at 27-29. In it, they laid out the key principles underlying their case:

- Minnesota's witness requirement forces voters to risk their health or refrain from voting;

- the witness requirement is ineffective as an anti-fraud measure;

- the witness requirement is unduly restrictive and significantly burdensome;

- the witness requirement does not serve any important state interest and has no significant benefit; and

- suspending enforcement of the witness requirement would not cause a drop in voter confidence.

Doc. 1 ¶¶12, 95, 62, 65, 7, 81, 87, 100, 109, 111, 102, 80. Ten days later, Plaintiffs sought a preliminary injunction for both the August and November elections. Doc. 13. Plaintiffs' sweeping relief would require Defendant to grant four specific types of relief. *See* Doc. 13 at 1-2.

When Defendant answered the complaint on June 9, Defendant denied all of the above allegations. Doc. 22 ¶¶12, 95, 62, 65, 7, 81, 87, 100, 109, 111, 102, 80. He also denied that heightened scrutiny applied to the witness requirement and argued that the requirement would survive any level of judicial scrutiny. Doc. 22 ¶¶106, 107. And he asserted that Plaintiffs failed to state a claim upon which relief could be granted. Doc. 22 at 40.

At some point in the next seven days, Defendant did a complete 180°. On June 16, the parties jointly submitted a proposed consent decree to the Court. Under the

proposed decree, Defendant agrees to refrain from enforcing the witness requirement and concedes to all four kinds of relief that Plaintiffs sought for the August primary. Doc. 24 at 6. Further, although Plaintiffs had submitted no further briefing, argument, or evidence, the decree makes Defendant concede that "Plaintiffs made a sufficiently strong showing on the merits of the claim"—directly contrary to his answer. Doc. 24 ¶20. Defendant made no attempt to explain this abrupt about-face. Whatever his reasons, the astonishing rapidity with which he turned heel calls into question his statement that the proposed consent decree was "negotiated at arm's length through counsel for the parties." Doc. 24 ¶18.

In return for his complete capitulation to Plaintiffs' demands, Defendant obtained nothing. While the consent decree does not cover the November election, Defendant let Plaintiffs withdraw their preliminary-injunction motion "without prejudice" and seek that exact relief again. Doc. 24 at 6. And while the decree suggests that Plaintiffs will not collect attorney's fees for their work to date, Doc. 24 at 5 ¶21, that concession adds nothing. Plaintiffs were unlikely to be a "prevailing party" in this case, *supra* I, they generated few expenses because they reused prior materials from Virginia and filed a motion that was never opposed, and they can still get fees going forward (including, presumably, for any preliminary-injunction motion they refile).

Worse, Defendant did not even *narrow* Plaintiffs' egregiously overbroad relief. For the August primary, Plaintiffs got everything they asked for: a complete and total suspension of the witness requirement for all voters. But several narrower

compromises were obvious. Defendant could have suspended the witness requirement only for the named individual plaintiffs. *See Frank II*, 819 F.3d at 386. He could have suspended it only for people who are elderly or immunocompromised. *E.g.*, *People First*, 2020 WL 3207824, at *29. He could have suspended only the statute limiting who can be a witness. *See* Minn. Stat. §203B.07. Or he could have required voters to provide a "written affirmation" that they tried, but failed, to find a witness for their ballot. *DNC I*, 2020 WL 1638374, at *20. To be clear, none of these alternatives would have been warranted had the Court reached the merits. But the fact that Defendant got none of them as concessions proves that, whatever the parties were doing from May 29 to June 16, it was not "negotiating."

Defendant cannot say that Plaintiffs' challenge to the witness requirement was so strong—or that the August primary was coming so soon—that he thought settlement was the only option. Both Defendant and his counsel took an oath to defend and uphold the State's elections laws. *See* Minn. Const. art. V, §§1, 6; Minn. Stat. §8.06. And the caselaw was on their side: most courts have rejected these COVID-19/election lawsuits, and the Sixth and Seventh Circuits recently wrote persuasive opinions rejecting challenges to similar witness requirements. Even if Defendant was (mistakenly) impressed with the merits of Plaintiffs' arguments, *but see supra* I, the *Purcell* principle was an easy defense that sidesteps the merits and defeats injunctive relief for the August primary. *Purcell* was low-hanging fruit, especially if Defendant was genuinely concerned with avoiding last-minute changes to the election

laws. But he apparently wasn't—*consenting* to last-minute changes to election laws is no way to avoid them.

At bottom, a federal court is not a place where parties with mutual interests can "purchase … a continuing injunction." *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993). Yet that is precisely what the proposed consent decree seeks. If the parties want "to alter the manner" in which elections are conducted, this Court should send them back to the "bargaining table" until they can come up with something that is actually fair to all sides. *Hialeah*, 140 F.3d at 983. Better yet, the parties should return to the state legislature—the representative body that Minnesotans have entrusted to enact, suspend, and modify their election laws. *See Dunn v. Carey*, 808 F.2d 555, 560 (7th Cir. 1986).

### III. The consent decree should be rejected because it unreasonably injures other parties.

Because consent decrees are not mere private contracts between the parties, a "judge has obligations to other litigants … and to members of the public whose interests may not be represented." *Kasper*, 814 F.2d at 338. This Court must reject any consent decree that "affects third parties" where the effect is either "unreasonable" or "proscribed." Doc. 26 at 2 (quoting *City of Miami*, 664 F.2d at 441). Intervenors, moreover, can outright "block approval of a consent decree" if it "adversely affects" their "legal rights or interests." *Johnson*, 393 F.3d at 1107. "[T]he mere threat of injury to [legal] rights [is] … sufficient." *Hialeah*, 140 F.3d at 982.

The proposed consent decree directly threatens the legal rights and interests of Proposed Intervenor-Defendants, their members, and other Minnesota voters. The Minnesota legislature enacted the witness requirement to deter fraud and to promote the integrity of elections. *Supra* I.C.ii. Removing this requirement—particularly for an election with "unprecedented levels" of absentee voting, Doc. 15 at 10—poses a serious threat that fraudulent or otherwise ineligible ballots will be cast.

As Justice Stevens stated in *Crawford*, "the risk of voter fraud"—particularly with "absentee ballots"—is "real." *Id.* at 195-96; *accord Griffin*, 385 F.3d at 1130-31 ("Voting fraud is a serious problem in U.S. elections … and it is facilitated by absentee voting."); *Veasey v. Perry*, 71 F. Supp. 3d 627, 641 (S.D. Tex. 2014) (finding broad "agreement that voter fraud actually takes place in abundance in connection with absentee balloting"); *Tex. Democratic Party*, 2020 WL 2982937, at *18 (Ho, J., concurring) ("[C]ourts have repeatedly found that mail-in ballots are particularly susceptible to fraud."). Groups from across the political spectrum "acknowledge that, when election fraud occurs, it usually arises from absentee ballots." Morley, *Election Emergency Redlines* 2, bit.ly/3aIqiPK. "[E]lection officials can neither exercise control over absentee ballots once they are mailed out to voters, nor ensure that they have been received and cast by the voters entitled to do so." *Id.* at 5. Stated differently, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin*, 385 F.3d at 1131.

The 2005 Commission on Federal Election Reform, co-chaired by former President Jimmy Carter and former Secretary of State James Baker, concluded that expanding mail-in voting "increase[s] the risks of fraud." *Building Confidence in U.S. Elections* 35, bit.ly/2KF3WUE (*Carter-Baker Report*). True, a few States already have all-mail voting. But those States took years to build the proper infrastructure; they didn't "just flip a switch" in the middle of a pandemic. *Washington: Where Everyone Votes by Mail*, N.Y. Times (Apr. 15, 2020), nyti.ms/3ektSlI. These States have only "avoided significant fraud," according to the Carter-Baker Commission, because they "introduc[ed] safeguards to protect ballot integrity, including signature verification." *Carter-Baker Report* 35. "[W]here the safeguards for ballot integrity are weaker," as they would be under the proposed consent decree, "[v]ote by mail is … likely to increase the risks of fraud." *Id.*

Increased fraud and abuse will, in turn, harm the rights of Proposed Intervenor-Defendants, their members, and other Minnesotans. The constitutional right to vote includes, not just the right to "cast … ballots," but also the right to "have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941). An individual's vote "won't count if it's cancelled by a fraudulent vote—as the Supreme Court has made clear in case after case." *Tex. Democratic Party*, 2020 WL 2982937, at *18 (Ho, J., concurring) (citing, *inter alia*, *Gray v. Sanders*, 372 U.S. 368, 380 (1963)); *accord Reynolds v. Sims*, 77 U.S. 533, 554-55 & n.29 (1964). "Every voter …, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a

right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974). Whether the dilution is "'in greater or less degree is immaterial.'" *Id.* at 226. Because "voting fraud impairs the right of legitimate voters to vote by diluting their votes," the consent decree *is* "an impairment of the right to vote." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007).

Even if the consent decree would not cause any ineligible ballots or vote dilution—an unlikely prospect given the expected surge in absentee voting and the large number of voters that Proposed Intervenor-Defendants represent—removing "'safeguards'" that help "'deter or detect fraud'" and "'confirm the identity of voters'" undermines "public confidence in the integrity of the electoral process." *Crawford*, 553 U.S. at 197 (quoting *Carter-Baker Report* 18). So do court orders that are issued close to the election. *Purcell*, 549 U.S. at 4-5. "Voters who fear their legitimate votes will be outweighed by fraudulent ones," or who are confused by last-minute court orders, "will feel disenfranchised." *Id.* at 4. That "debasement" denies "the right of suffrage … just as effectively as … wholly prohibiting the free exercise of the franchise." *Id.*

Plaintiffs might argue that these harms are inevitable, since a similar consent decree has been entered in one of the state-court cases. *See* Doc. 28 (alerting the Court to the consent decree in *LaRose v. Simon*, No. 62-CV-20-3149 (Minn. Dist. Ct. June 17, 2020)). But the Republican Party has moved for intervention in that case too. If that consent decree stands, its approval weighs *against* approving this one. Given the risk

of "overlapping and perhaps inconsistent commands," it would be "particularly inappropriate" for this Court to enter a consent decree when "[m]uch of the relief requested here has been provided by [another consent] decree." *United States v. City of Jackson*, 519 F.2d 1147, 1154 (5th Cir. 1975). At the very least, such an overlapping decree would not be a worthwhile "commitment of the court's limited resources." *Kasper*, 814 F.2d at 338.

## CONCLUSION

For all these reasons, and any other reasons this Court deems persuasive in its discretion, the proposed consent decree should be rejected.

Dated: June 20, 2020                          Respectfully submitted,

                                                       */s/ Cameron T. Norris*
Richard G. Morgan                           Thomas R. McCarthy (pro hac vice)
LEWIS BRISBOIS                              Cameron T. Norris (pro hac vice)
90 South 7th Street                           Jeffrey M. Harris
Suite 2800                                      CONSOVOY MCCARTHY PLLC
Minneapolis, MN 55402                     1600 Wilson Blvd., Ste. 700
612-428-5000                                  Arlington, VA 22209
612-428-5001 (fax)                           (703) 243-9423
richard.morgan@lewisbrisbois.com     cam@consovoymccarthy.com

                                                       Patrick Strawbridge
                                                       CONSOVOY MCCARTHY PLLC
                                                       Ten Post Office Square
                                                       8th Floor South PMB #706
                                                       Boston, MA 02109

*Counsel for Proposed Intervenor-Defendants Donald J. Trump for President, Inc.,
Republican National Committee, and Republican Party of Minnesota*

35