**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

League of Women Voters of Minnesota
Education Fund, Vivian Latimer Tanniehill,

      Plaintiffs,

      v.

Steve Simon, in his official capacity as
Secretary of State of Minnesota,

      Defendant.

Civil Action No. 0:20-cv-01205-ECT-TNL

**PLAINTIFFS' MEMORANDUM OF
LAW IN SUPPORT OF PROPOSED
CONSENT DECREE**

Plaintiffs League of Women Voters of Minnesota Education Fund (LWVMN) and Vivian Latimer Tanniehill respectfully submit this memorandum in support of the proposed Stipulation and Partial Consent Judgment and Decree ("Proposed Consent Decree"), ECF 24. The Proposed Consent Decree protects Minnesotans' fundamental right to vote in the August 2020 primary and provides significant benefits to the State. Because the Proposed Consent Decree is both substantively and procedurally fair, the Court should approve it.

## BACKGROUND

This case concerns Minnesotans' right to vote safely during the COVID-19 pandemic. Minnesota statutory law requires that absentee voters have their ballots witnessed and signed by another registered Minnesota voter, a notary, or an official authorized to administer oaths. *See* Minn. Stat. § 203B.07, subd. 3; Minn. Stat. § 204B.45. For many members of Plaintiff LWVMN, including Plaintiff Latimer Tanniehill, the witness requirement makes it impossible to vote without interacting face-to-face with another person outside the household, significantly increasing their risk of contracting or spreading COVID-19. *See* Complaint, ECF 1 at ¶¶ 4, 12, 13.

1

Plaintiffs filed this lawsuit against Secretary of State Steve Simon (the "Secretary") on May 19, 2020, seeking an injunction and declaratory judgment permitting Minnesota voters to vote by absentee ballot in the 2020 elections without involving a witness, as well as permanent relief from Minnesota's restrictions on who may serve as a witness. *Id.* ¶7. On May 29, Plaintiffs moved for a preliminary injunction prohibiting enforcement of the witness requirement for the duration of 2020; requiring the Secretary to modify official printed materials to avoid explicitly or implicitly directing voters to have their absentee ballots witnessed; and requiring the Secretary to "undertake a public education campaign sufficient to inform the public" that the witness requirement is suspended for 2020. ECF 13. The Secretary has not filed a response to the Motion for Preliminary Injunction, but answered the complaint on June 9, denying that Plaintiffs were entitled to any relief. ECF 22.

While the Motion for Preliminary Injunction was pending, the parties negotiated an agreement to partially resolve this lawsuit. On June 16, the parties jointly submitted their Proposed Consent Decree to the Court for approval. ECF 24. Under the Proposed Consent Decree, the Secretary would agree not to enforce the witness requirement in the state primary election scheduled for August 11, 2020, and take steps to make local election officials and voters aware that the witness requirement does not apply in that election. ECF 24 at 6. In return, Plaintiffs would withdraw their Motion for Preliminary Injunction without prejudice and would forgo any entitlement to fees, expenses, and costs incurred to date. ECF 24 at ¶¶ 16, 21. The Court scheduled a fairness hearing on the Proposed Consent Decree for June 18.

Also on June 16, Judge Sara Grewing of the Ramsey County District Court approved a Stipulation and Partial Consent Decree in *LaRose v. Simon* (Court File No. 62-CV-20-3149). The *LaRose* consent decree, like the Proposed Consent Decree here, suspends the witness

requirement for the August primary and requires the Secretary to take certain steps to implement and publicize that suspension. *See* ECF 28-1 (*LaRose* consent decree).

On June 18, Donald J. Trump for President, Inc., the Republican National Committee, and the Republican Party of Minnesota (together, "Proposed Intervenors"), filed an emergency motion to continue the fairness hearing in this case scheduled for that day and to give Proposed Intervenors an opportunity to seek intervention and oppose the Proposed Consent Decree. ECF 29. The Court granted that motion. ECF 33. On June 20, Proposed Intervenors moved for intervention as of right or permissive intervention, ECF 37, and filed a memorandum in opposition to the Proposed Consent Decree, ECF 41. That same day, the Republican Party of Minnesota, the Republican National Committee, and the National Republican Congressional Committee filed a notice of intervention in the *LaRose* state-court proceedings. A copy of the notice of intervention in *LaRose* is attached to this memorandum as Exhibit 1.

On June 22, Plaintiffs in this case submitted a letter to the Court, requesting that the pending request to enter the Proposed Consent Decree be held in abeyance until the *LaRose* consent decree is modified or lifted or after the August primary, whichever occurs soonest. ECF 44. This scheduling request does not change Plaintiffs' substantive position that the Court should, at an appropriate time, approve the Proposed Consent Decree.

## ARGUMENT

When reviewing a proposed consent decree, the Court must review the agreement to ensure that it is fair, reasonable, and adequate. *United States v. Metropolitan St. Louis Sewer Dist.*, 952 F.2d 1044 (8th Cir. 1992) (citing *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir.1988)). This analysis involves both the substantive and procedural aspects of the settlement. *See United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1018-20 (8th Cir. 2002). The court has the authority to approve a consent decree that overrides state law provisions when such a remedy

is appropriate to rectify a potential violation of federal law. *See St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 270 (8th Cir. 2011); *League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV00024, 2020 WL 2158249, at *6 (W.D. Va. May 5, 2020) (district court should examine the merits but need not definitively decide them in approving consent decree); *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 296 F. Supp. 3d 959, 968 (S.D. Ind. 2017) (consent decree may set aside state laws when the parties demonstrate a "probable violation of federal law" based on "particularized findings") (citing *Perkins v. City of Chicago Heights*, 47 F.3d 212, 217 (7th Cir. 1995)); *cf. Lawyer v. U.S. Dep't of Justice*, 521 U.S. 567, 576 (1997) (upholding approval of consent decree in redistricting case, although preexisting redistricting plan was not first adjudicated unconstitutional).

The Proposed Consent Decree here prevents a violation of the Constitution and is in all respects fair, reasonable, and adequate, both for the parties and for non-parties. It should be approved.

## I.   The Proposed Consent Decree is substantively fair, reasonable, and adequate.

"The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Marshall v. National Football League*, 787 F.3d 502 (8th Cir. 2015). "A consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction, must come within the general scope of the case made by the pleadings, and must further the objectives of the law upon which the complaint was based." *McCourt v. City of Chaska*, No. 18-cv-1559, 2018 WL 5669317, at *2 (D. Minn. Nov. 1, 2018) (Tostrud, J.) (quoting *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986)). However, the court need not undertake the type of detailed investigation that would be

necessary to reach a judgment on the merits. *Metropolitan St. Louis Sewer Dist.*, 952 F.2d at 1044; *see also Armstrong v. Bd. of School Directors of Milwaukee*, 616 F.2d 305, 314-15 (7th Cir. 1980). The court's decision need only rest on "well-reasoned conclusions," rather than "mere boilerplate." *Van Horn*, 840 F.2d at 607.

Here, all relevant factors demonstrate that the Proposed Consent Decree is substantively fair, reasonable, and adequate.

A.   Plaintiffs have demonstrated more than a sufficient likelihood of success on the merits of their undue burden claim to support the Proposed Consent Decree.

In the absence of the Proposed Consent Decree, the Court would likely conclude that Minnesota's application of the witness requirement during the COVID-19 pandemic unduly burdens the right to vote.[1]

The right to vote is unquestionably a constitutionally protected liberty interest. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (declaring that "voting is of the most fundamental significance under our constitutional structure"). When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). A severe restriction on voting rights "must be narrowly drawn to advance a state interest of compelling importance." *Id.* at 428 (citation omitted). Even if a challenged

---

[1] There is no dispute that the court has jurisdiction over the subject matter of Plaintiffs' claims. *See* Def. Answer, ECF 22 at ¶¶ 8-11 (agreeing with Plaintiffs that the Court has jurisdiction over the subject matter of this action and personal jurisdiction over the defendant); Proposed Int. Answer, ECF 37-1 at ¶¶ 8-11 (same).

restriction falls short of being "severe," courts must employ a "sliding scale," subjecting each voting restriction to a level of scrutiny calibrated to the burden it imposes. *Fish v. Schwab*, 957 F.3d 1105, 1124, 1124 n. 4 (10th Cir. 2020).

As Plaintiffs demonstrated in their Memorandum in Support of Preliminary Injunction, ECF 15, the witness requirement imposes a severe (or, at a minimum, significant), burden on Minnesotans' right to vote as applied during the COVID-19 pandemic by denying them *any* safe method of casting a ballot without risking infection from this deadly disease. This burden is imposed even though the witness provision provides no substantial benefit to the State's interest in preventing voter fraud, safeguarding voter confidence, and protecting the integrity of the election.

In the interest of conserving judicial resources and avoiding repetition, Plaintiffs incorporate by reference the arguments made and evidence presented in their Memorandum in Support of Preliminary Injunction. ECF 15 at 15-23. However, it bears emphasis that one of the cases Plaintiffs previously cited, *League of Women Voters of Virginia v. Virginia State Board of Elections*, No. 6:20-CV-00024, 2020 WL 2158249 (W.D. Va. May 5, 2020), addressed *precisely* the issue now before this Court: whether to approve a consent decree providing that the state would not enforce its witness requirement for absentee voting in a 2020 summer primary election in light of COVID-19. The court approved the Virginia consent decree, finding that enforcing Virginia's witness requirement during the pandemic was "a probable violation of federal law." *Id.* at *6. As the court explained,

> [T]he measure is too restrictive in that it will force a large class of Virginians to face the choice between adhering to guidance that is meant to protect not only their own health, but the health of those around them, and undertaking their fundamental right—and, indeed, their civic duty—to vote in an election. The Constitution does not permit a state to force such a choice on its electorate.

*Id.* at *8 (citing Harper v. Va. State Bd. of Elections, 383 U.S. 663, 670 (1966)).

It is no response to suggest, as Proposed Intervenors have, that in-person voting before and on Election Day is available in Minnesota when in-person voting presents an even greater risk of exposure to COVID-19 than interacting with a witness. *See* ECF 15 at 9-10, 16.[2] The State cannot leave its citizens without any way to vote without exposing themselves to a deadly virus. *See Republican Party of Arkansas v. Faulkner Cty.*, 49 F.3d 1289, 1294 (8th Cir. 1995) ("[A]n alternative means of [ballot] access must be provided absent a sufficiently strong state interest"); *Thomas v. Andino*, No. 3:20-cv-01552-JMC, 2020 WL 2617329, at *19 n.20 (D.S.C. May 25, 2020) ("In-person voting, while still technically an available option, forces voters to make the untenable and illusory choice between exercising their right to vote and placing themselves at risk of contracting a potentially terminal disease."). Nor can it be seriously argued that, merely because Minnesota provides in-person voting, its restrictions on absentee voting are immune from constitutional scrutiny. *See Self Advocacy Systems N.D. v. Jaeger*, No. 3:20-cv-00071, 2020 WL 2951012, at *8 (D.N.D. Jun. 3, 2020) ("Although the right to apply for and vote via absentee ballot is not constitutionally on par with the fundamental right to vote, a state that creates a system for absentee voting must administer it in accordance with the constitution." (citation omitted)). Given the circumstances, enforcement of that requirement amounts to an unconstitutional burden on Minnesotans' right to vote.

Proposed Intervenors' insistence that "*the State* has determined that in-person voting can be done safely and effectively" while challenging a consent decree to which the chief state election official is a party is bizarre. ECF 41 at 18 (emphasis added). Plaintiffs agree with Proposed Intervenors that "[f]ederal courts cannot and should not second-guess the judgment of

---

[2] Proposed Intervenors argue that COVID-19 has caused the additional burdens on the right to vote and therefore no state action is present. ECF 41 at 17. This is nonsense. Plaintiffs allege that it is Defendant's enforcement of the witness requirement—in the context of COVID-19—that is unlawful. That enforcement is plainly state action.

Minnesota's election officials[,]" and "[q]uestions about how to 'accommodate voters' interests while also striving to ensure their safety' are best left to election officials, who are 'better positioned . . . to accommodate the many intersecting interests in play in the present circumstances.'" ECF 41 at 19 (quoting *Democratic Nat'l Comm. v. Bostelmann*, Doc. 30, No. 20-1538 (7th Cir. Apr. 3, 2020)).

This Proposed Consent Decree represents Minnesota's chief election official's sound judgment on how to ensure voters can safely cast their ballots while protecting public health. Thus, the Court should therefore afford significant deference to the Secretary's determination that it represents the best path toward a constitutionally sound and publicly safe election.[3] *See S. Bay United Pentecostal Church v. Newsom*, 2020 WL 2813056, at *1 (U.S. May 29, 2020) (Roberts, C.J., concurring) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.' When those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'"). The Secretary has numerous mechanisms at his disposal to prevent fraud but limited means of ensuring safe voting during a pandemic. This Court should not second-guess the Secretary's judgment on this score.

Conversely, the Court should give little weight to assertions of state interests that are made by self-interested private parties, rather than by the State itself, which is capable of asserting its own interests to the extent that they are threatened. Moreover, as explained in more

---

[3] Proposed Intervenors suggest that in-person "is no more dangerous than other activities that the State deems safe, like going to the grocery store or having 9 friends over for a visit." ECF 41 at 21. But it should go without saying that Minnesota's judgment that residents are now *allowed*— with precautions—to engage in some public activities does not mean Minnesota believes it can *require* residents to engage in risky social activity in order to vindicate their fundamental right to vote. Moreover, in arguing that the witness requirement is not burdensome, Proposed Intervenors do not even attempt to address Plaintiff Latimer Tanniehill's declaration detailing the burdens it places on her personally.

detail below, removing the witness requirement would create no significant risk of fraud. *See infra,* Section III.B.

B.   The *Purcell* Principle Does Not Bar Relief for the August Primary.

Proposed Intervenors cite *Purcell v. Gonzalez*, 549 U.S. 1 (2006), as support for their contention that it is too late for this Court to intervene and approve Plaintiffs' and the State's consent decree. In opposing this consent decree, Proposed Intervenors far overstate the breadth of the *Purcell* decision and the context of its invocation in subsequent cases. *Purcell* cautions judicial restraint in issuing "orders affecting elections, *especially conflicting orders*, [that] can themselves result in voter confusion and consequent incentive to remain away from the polls." 549 U.S. at 4-5 (emphasis added). But the only risk of voter confusion here is that which would arise from an order from this Court *denying* relief when a state court has already issued similar relief that is already being implemented, and where early and absentee voting have not yet begun. As the Court is aware, the Ramsey County District Court has approved a Stipulation and Partial Consent Decree in *LaRose v. Simon* (Court File No. 62-CV-20-3149), which suspends the witness requirement for the August primary. *See* ECF 28-1. Creating a conflict between the state and federal court as to whether the witness requirement is enforceable for the August primary would almost certainly result in voter confusion.

First, in the context of *Purcell*, this Court's deference to the Secretary should be at its height. At its heart, the *Purcell* doctrine is about allowing election officials to conduct their election without court interference at the last moment. But there is no *Purcell* rule against election officials making adjustments to election infrastructure to accommodate emerging needs in the run up to an election. Intervenors cite *no* case where a Court has invoked *Purcell* to stop judicial relief that was obtained by consent of the governing election officials. For this Court to

step in, at the last moment, and insist on the status quo when the Secretary has argued that change is necessary for a smooth election would flip *Purcell* on its head.

Second, the Proposed Intervenors do not identify any *actual* confusion that will result from the consent decree.  As Proposed Intervenors concede, "[t]he *Purcell* principle ensures that voters, candidates, and political parties known and adhere to the same neutral rules throughout the election process." ECF 41 at 10. The proposed consent decree in this case was filed and can be approved before a single vote in Minnesota is cast, thereby ensuring that the entire primary election is conducted under the same set of rules. Moreover, the proposed consent decree does not change who is eligible to vote absentee, nor does it expand the time period for requesting, casting, or counting ballots; it merely facilitates the casting of ballots by already eligible voters by relieving them of the obligation to involve a third party in the process. It is "narrowly tailored so as to infringe state sovereignty as minimally as possible." *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995).

Proposed Intervenors' comparison to the Supreme Court's stay of a judicial order involving the recent Wisconsin primary is misplaced. There, the district court ordered relief well after the early and absentee voting period in Wisconsin had already begun and less than two weeks before Election Day. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (noting that "absentee voting ha[d] been underway for many weeks"). Here, early and absentee voting have not yet begun; the rules will stay the same for the entire voting period, and there is no risk of voter confusion. Moreover, the Court emphasized the "unusual nature" of the District Court Order in Wisconsin, including that court's issuance of a second order clarifying its initial relief, "in essence enjoin[ing] nonparties to [that] lawsuit," and that the relief ordered by the District Court was not requested by the Plaintiffs.  *Id*.

The nature of the relief required by the consent decree also counsels in favor of approval. Unlike the election-related judicial orders stayed under *Purcell* that Intervenors refer to in their opposition, suspension of the witness requirement does not present a significant judicial intrusion into the electoral process such that voter confusion is likely.[4] The consent decree merely removes an administrative and procedural burden from already eligible voters, allowing them to exercise the franchise without risking their personal health or the health of others, without adversely affecting the state's interest in election integrity.

Finally, Intervenors' argument, ECF 41 at 12-14, that it is too soon for Plaintiffs to seek preliminary injunctive for the November general election is premature—while otherwise irrelevant and inapposite to this Court's consideration of the Proposed Consent Decree— undermines their position that it is too late to seek relief for the August primary. Under Intervenors' theory, there would never be an appropriate time for judicial scrutiny of election laws, because the harms caused by unduly burdensome election regulations would remain "speculative" and "uncertain" until the election approaches, at which point Intervenors invoke *Purcell* and argue that it is too late for judicial intervention. It cannot always be either too soon or too late to vindicate the right to vote in federal court, and Plaintiffs cannot be expected to

---

[4] The cases cited by Proposed Intervenors in support of their *Purcell* argument are further distinguishable because they represent much more disruptive and significant interventions into the electoral process than this case, including: challenges to the contents of the ballot, *Williams v. Rhodes*, 393 U.S. 23 (1968) (denying injunctive relief to place additional candidates on the ballot in a pre-*Purcell* challenge, where doing so would require the reprinting of all ballots), the time during which voting can take place, *Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) (denying relief in a challenge to, *inter alia*, extend the submission deadline for petition signatures); *Husted v. Ohio State Conf. of NAACP*, 573 U.S. 988 (2014) (denying relief in a challenge to reduction of early voting dates), a complete overhaul of a state's election system, *North Carolina v. League of Women Voters of N.C.*, 574 U.S. 988 (2014), or the very composition of the electoral map, *Perry v. Perez*, 565 U.S. 1090 (2011).

assert their constitutional rights only when they satisfy Intervenors' Goldilocks approach to litigation.

## II.     The Proposed Consent Decree is a procedurally fair compromise negotiated at arm's length.

In addition to being substantively fair in light of the merits of Plaintiffs' claim, the Proposed Consent Decree is procedurally fair. "[C]ourts in the Eighth Circuit have held that 'there is a presumption of fairness when a settlement is negotiated at arm's length by well informed counsel.'" *Soderstron v. MSP Crossroads Apartments LLC*, Civil No. 16–233, 2018 WL 692912, at *3 (D. Minn. Feb. 2, 2018) (*quoting In re Charter Commc'ns, Inc. Sec. Litig.*, No. 02–1186, 2005 WL 4045741, at *5 (E.D. Mo. June 30, 2005)). That is exactly the type of process that produced the Proposed Consent Decree in this case.

Proposed Intervenors' assertion that the Secretary "obtained nothing" in entering the Proposed Consent Decree, ECF 41 at 29, is simply false. To begin, the Secretary successfully negotiated for Plaintiffs to forgo any motion for fees, expenses, or costs incurred until the date when the Proposed Consent Decree is entered. ECF 24 at ¶21. Proposed Intervenors' claim that this term of the agreement "adds nothing," ECF 41 at 29, is puzzling. Plaintiffs' attorney fees and expenses for the work they have done to date—including filing the complaint, gathering evidence, retaining and paying an expert, writing the memorandum in support of their motion for a preliminary injunction, and negotiating the Proposed Consent Decree[5]—would be substantial, and the Proposed Consent Decree frees the Secretary from the risk of paying those fees. That

---

[5] Proposed Intervenors argue that Plaintiffs "generated few expenses because they reused prior materials from Virginia." They are confused. Plaintiffs' counsel in this case does not overlap with Plaintiffs' counsel in Virginia. Indeed, Proposed Intervenors repeatedly lump the all litigants involved in voting rights cases across the country as the functional equivalents of the Democratic Party. *See, e.g.*, ECF 41 at 2, 27. Such spurious assertions are unsupported and emphatically false.

Plaintiffs may seek fees, expenses, and costs for future work is true, but irrelevant. And while Proposed Intervenors argue that "Plaintiffs were unlikely to be a 'prevailing party' in this case," *id.*, it was reasonable—indeed, correct—for the Secretary to believe that Plaintiffs had at least a realistic chance of prevailing and thus obtaining fees, expenses, and costs. *See supra*, Section I.A.

Nor is fiscal conservation the only benefit the Secretary would derive from the Proposed Consent Decree. The agreement would also compel Plaintiffs to withdraw their pending Motion for Preliminary Injunction, thus delaying any adjudication of whether Minnesota may enforce the witness requirement for the November 2020 general election. ECF 24 at ¶16. This delay—while not desired by Plaintiffs, who sought to litigate the November issue as expeditiously as possible—is something the Secretary could reasonably want. The Secretary now has more time to implement a litigation strategy regarding the November election (a higher-stakes matter than the August primary). If the Secretary wishes to develop a thorough record to support enforcement of the witness requirement, the Proposed Consent Decree gives him time to do so. While Proposed Intervenors evidently believe the Secretary could have extracted more concessions than he did, ECF 41 at 29-30, the Court need not decide whether the Secretary drove the hardest conceivable bargain.

Instead, the Court's focus is properly on whether the parties negotiated in good faith and at arm's length. They did. Proposed Intervenors claim that "the sequence of events here is inconsistent with arm's-length negotiations" because the Secretary filed a pleading in opposition to Plaintiffs' claims on June 9, then submitted the Proposed Consent Decree to the Court on June 16. ECF 41 at 28. This contention is not just wrong, but backward. That the Secretary filed an answer opposing Plaintiffs' claims is evidence that the parties have an adversarial, not collusive,

relationship. The Secretary is continuing to defend the witness requirement; he merely conceded that it should be suspended for the August primary, in light of the ongoing pandemic and the likelihood that requiring witnesses for this primary would be found unconstitutional.

Proposed Intervenors' suggestion that the Secretary "failed to convince the legislature to relax absentee-voting rules" and therefore engineered the Proposed Consent Decree as an end-run around the legislature, ECF 41 at 27, is equally meritless. The Secretary *specifically said* in April that the legislation he was supporting would *not* affect the witness requirement.[6] It makes no sense that the Secretary would collude with Plaintiffs to implement a policy proposal he explicitly disavowed.

Without actual evidence of any procedural impropriety in this case, Proposed Intervenors rely largely on general grievances about the prevalence of what they see as collusive public-law settlements, and about the Democratic Party's litigation tactics. ECF 41 at 26-27. Whatever their merits, these complaints are irrelevant here. The Democratic Party and its lawyers are playing no (0) role in this case. Plaintiff LWVMN is a nonpartisan organization that promotes electoral participation by people with all viewpoints; so is Campaign Legal Center, which represents Plaintiffs. Moreover, Plaintiffs have no interest in undermining the Minnesota legislative process, in which LWVMN is regularly engaged. *See* Declaration of Michelle Witte, ECF 15-21 at ¶17. This case is simply an attempt by Plaintiffs—uninvited and opposed by the Secretary—to vindicate their federal constitutional rights in federal court. There is nothing untoward about bringing, then partially settling, such a lawsuit.

---

[6] Stephen Montemayor, *Minnesota secretary of state proposes election changes because of COVID-19*, STAR TRIBUNE (Apr. 8, 2020), https://www.startribune.com/minnesota-secretary-of-state-pushes-election-changes/569472892/.

III.    **The Proposed Consent Decree does not injure non-parties.**

Proposed Intervenors have also failed to provide evidence that the Proposed Consent Decree will adversely affect them, or anyone else. They therefore fall well short of the high standard for rejecting a consent decree based on its anticipated impact on non-parties.

Even assuming Proposed Intervenors are allowed to intervene in this case, they do "not have power to block the decree merely by withholding [their] consent." *Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986). "[I]n instances in which the rights of third parties are the basis for blocking the entry of, or vacating, a consent decree, there must be a demonstrable injury or adverse effect upon the group not party to the decree. *Conservation Law Foundation of New England v. Franklin*, 989 F.2d 54, 59 (1st Cir. 1993). Where an objecting third party fails "to allege any specific injury" the Court should approve the consent decree. *United States v. Board of Educ. Of City of Chicago*, 11 F.3d 668, 672 (7th Cir. 1993). Even if the objector does demonstrate some harm, that is not necessarily enough: "a consent decree entered by a federal court, like any other injunction, can have adverse consequences on third parties without thereby being rendered invalid." *Id.*

A.  <u>The Proposed Consent Decree does not adversely affect any non-party's legal rights or obligations.</u>

In arguing that the Proposed Consent Decree should be rejected for the sake of non-parties, Proposed Intervenors rely primarily on cases involving proposed settlements that deprived third parties of legal rights or saddled them with new legal obligations. These cases are inapposite because the Proposed Consent Decree does no such thing.

For example, the consent decree in *United States v. City of Miami*, 664 F.2d 435, 440–41 (5th Cir. 1981), is easily distinguishable from the Proposed Consent Decree here. In *City of Miami*, the Fifth Circuit held that the consent decree adversely affected the defendant-union's

legally protected interests because the decree bound the defendant-union to a compromise which altered its contractual rights. *Id.* at 447. Similarly, in *Bass v. Federal Savings & Loan Insurance Corp.*, "one of the primary litigants was able to make an arrangement with an essentially disinterested third party that had the effect of resolving against the other primary litigants' wishes the immediate dispute over pretrial payout of the escrowed funds." 698 F.2d 328, 330 (7th Cir. 1983). And in *United States v. City of Hialeah*, the consent decree at issue specifically altered the contractual relationship between the objecting intervenors and their employer. 140 F.3d 968, 982-83 (11th Cir. 1998). Unlike the decrees in *City of Miami*, *Bass*, and *City of Hialeah*, the Proposed Consent Decree here "imposes no legal duties or obligations" on Proposed Intervenors or anyone else. *Local No. 93, Intern. Ass'n of Firefighters*, 478 U.S. at 530-531. Nor were any of the "primary litigants" cut out of the partial settlement negotiations here. *Bass*, 698 F.2d at 330.

Proposed Intervenors rely especially on *Kasper v. Bd. of Election Comm'rs of the City of Chi.*, 814 F.2d 332, 338 (7th Cir. 1987). That case, too, is distinguishable on the ground that the proposed consent decree there threatened the legal rights of third parties—specifically, voters who would be placed at greater risk of being purged from the rolls. *Id.* at 340. Moreover, Proposed Intervenors fail to acknowledge that the first consideration supporting the court's decision to deny the parties' consent decree in *Kasper* was that the decree "was filed on the eve of the canvass" that the decree sought to affect, which did not give the judge "time to think." *Id.* at 339. In this case, the parties filed the consent decree over two months before Minnesota's August primary and nearly two weeks before the beginning of absentee voting for that election. ECF No. 24.

B. <u>Intervenors have provided no evidence that the Proposed Consent Decree will lead to voter fraud.</u>

Intervenors allege that the Proposed Consent Decree will injure non-parties by leading to voter fraud. Yet, Proposed Intervenors' concerns about voter fraud are unsupported by evidence. Proposed Intervenors attempt to distinguish states that routinely conduct all-mail elections without experiencing massive voter-fraud without providing a single distinction between those states' mail absentee ballot verification process and Minnesota's. As Proposed Intervenors note, the 2005 Commission on Federal Election Reform ("Carter-Baker Commission") suggested that states can prevent absentee ballot voter fraud by "including signature verification."[7] ECF 41 at 35. But Minnesota already includes signature verification in its absentee ballot verification process. Minn. Stat. § 203B.121, subd. 2(b)(3). This verification step is separate from and unrelated to the witness requirement; Minnesota verifies only *voter* signatures, not witness signatures. Moreover, none of the five states that hold all-mail elections—Colorado, Hawaii, Oregon, Washington, and Utah—have any form of a witness requirement for absentee ballots.

Proposed Intervenors incorrectly suggest that the only other mechanism Minnesota has in place to verify the authenticity of absentee ballots is the prosecution of criminal penalties. ECF 41 at 22. As Plaintiffs explained in their Motion for Preliminary Injunction, ECF 15 at 5, the State's process for verifying absentee ballots requires a determination by at least two ballot board members—who, in most circumstances, belong to two different major political parties—that each ballot satisfies six independent criteria, five of which have nothing to do with the witness requirement, and one of which is signature verification. Minn. Stat. § 203B.121, subd. 2.

---

[7] "To verify the identity of voters who cast absentee ballots, the voter's signature on the absentee ballot can be matched with a digitized version of the signature that the election administrator maintains. While such signature matches are usually done, they should be done consistently in all cases, so that election officials can verify the identity of every new registrant who casts an absentee ballot." *Building Confidence in U.S. Elections* 19-20, COMM'N ON FED. ELECTION REFORM (2005), https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf.

- *First*, "[t]he voter's name and address on the absentee ballot application must match the voter's name and address on  the  signature  envelope." Minn.  R.  8210.2450, subp.  2; *see also* Minn. Stat. § 203B.121, subd. 2(b)(1).

- *Second*, the ballot board members must determine that "the voter signed the certification on the envelope." Minn. Stat. § 203B.121, subd. 2(b)(2).  "A ballot must be rejected . . . on the basis of the signature if the name signed is clearly a different name than the name of the voter as printed on the signature envelope." Minn. R. 8210.2450, subp. 2.

- *Third*, the ballot board members must check whether "the voter's Minnesota driver's license, state identification number, or the last four digits of the voter's Social Security number are the same as a number on the voter's absentee ballot application  or  voter record." If so, the ballot may move on to the next verification step; if not, the ballot board members "must compare the signature provided by the applicant to determine whether the ballots were returned by the same person to whom they were transmitted." Minn. Stat. § 203B.121, subd. 2(b)(3); see also Minn. R. 8210.2450, subp. 3.

- *Fourth*, the ballot board members must verify that "the voter is registered and eligible to vote in the precinct or has included a properly completed voter registration application in the return envelope." Minn. Stat. § 203B.121, subd. 2(b)(4); see  also Minn. R. 8210.2450, subp. 4.

- *Fifth*, the ballot board members must check that "the certificate has been completed as prescribed in the directions for casting an absentee ballot." Minn. Stat. § 203B.121, subd. 2(b)(5). This is the only one of the six verification steps that depends on the presence of a witness signature. The witness requirement is deemed satisfied if the

witness has signed the required statement and done any one of the following: provided a Minnesota address, provided a title indicating that the witness is eligible to administer oaths, or affixed a notarial stamp. Minn. R. 8210.2450, supb. 5. The ballot board does not check whether the witness's name or address matches an existing voter registration record for purposes of determining whether the ballot in question should be accepted or rejected. *See id.*

- *Sixth*, it must be confirmed that "the voter has not already voted at that election, either in person or, if it is after the close of business on the seventh day before the election, by absentee ballot." Minn. Stat. § 203B.121, subd. 2(b)(6); see also Minn. R. 8210.2450, subp. 6.

The State's detailed verification process involves more steps than the Carter-Baker Commission suggested and more steps than Oregon, which conducts elections entirely by mail and which Proposed Intervenors concede has "avoided significant fraud."[8] ECF 41 at 35. Minnesota's safeguards for ballot integrity, even without the witness requirement, are therefore stronger than states which conduct their elections entirely by mail and avoid voter fraud. Proposed Intervenors' claim that eliminating just one of the state's six independent steps for verifying absentee ballots will lead to "increased fraud and abuse" is unsubstantiated. The Secretary admitted that Minnesota has no significant history of fraud and Proposed Intervenors have provided no evidence to the contrary. ECF 22 at 23. Proposed Intervenors have likewise failed to prove that eliminating the state's witness requirement will alter that history.

---

[8] Oregon's absentee ballot verification process does not include the additional steps of matching the voter's name, address, driver's license, state identification number, or the last four digits of the voter's Social Security number on their ballot information on their ballot application or voter record. Or. Stat. § 254.470.

Ironically, eliminating Minnesota's witness requirement should *ease* Proposed Intervenors' concerns about fraud. One of the Carter-Baker Commission's foremost concerns about absentee voting was that "citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation," from the people around them.[9] The Proposed Consent Decree would eliminate this concern by allowing voters to cast their absentee ballots in the privacy of their own homes, where they can escape any pressure from unwanted onlookers.

C.   The Proposed Consent Decree would not waste the Court's resources on a moot issue.

Finally, Proposed Intervenors suggest that entering the Proposed Consent Decree would waste the Court's resources because an overlapping consent decree has been entered in state court. ECF 41 at 34-35. Although Proposed Intervenors do not expressly argue that the Proposed Consent Decree here is moot, it bears emphasis—if only in abundance of caution—that there is no mootness issue here.

A case or controversy is not rendered moot by a parallel state court decision that is likely to be appealed. *Myer v. Americo Life, Inc.*, 469 F.3d 731 (8th Cir. 2006). Some of the Proposed Intervenors have already "moved for intervention in the parallel state court proceeding," in order to oppose the consent decree entered there. ECF 41 at 34. Therefore, the current controversy "remains live" unless and until all potential appeals are exhausted. *Id.* at 733. This would be true even if the parallel proceeding completely worked its way through the state courts. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 n. 7, (2005) (controversy not moot where state courts had fully resolved same claims as those presented in federal lawsuit, because losing

---

[9] *Building Confidence in U.S. Elections* 46, COMM'N ON FED. ELECTION REFORM (2005) https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf.

party indicated that it would appeal the state Supreme Court's decision to the U.S. Supreme Court).

Therefore, although the Court could reasonably abstain from ruling on the Proposed Consent Decree at this time,[10] the Proposed Consent Decree is not moot. Indeed, by entering the Proposed Consent Decree, this Court could provide Minnesota with more clarity and assurance by providing a backstop in the case that the state court consent decree is disturbed.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the Proposed Consent Decree.

Date: June 22, 2020                    Respectfully submitted,

                                      /s/ Julia Dayton Klein
                                      _____

                                      **LATHROP GPM LLP**
                                      Julia Dayton Klein (MN Bar #319181)
                                      500 IDS Center
                                      80 South 8th Street
                                      Minneapolis, MN 44501
                                      Julia.DaytonKlein@lathropgpm.com
                                      (612) 632-3153

                                      **CAMPAIGN LEGAL CENTER**
                                      Danielle Lang*
                                      Jonathan Diaz*
                                      Mark Gaber*
                                      1101 14th Street NW, Suite 400
                                      Washington, DC 20005
                                      dlang@campaignlegalcenter.org
                                      (202) 736-2200

---

[10] *See Harrison v. NAACP*, 360 U.S. 167, 176 (1959) (recognizing that in some cases federal courts should not adjudicate the constitutionality of state enactments until the state courts have been afforded a reasonable opportunity to pass upon them).

*Admitted *pro hac vice*