# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MINNESOTA EDUCATION FUND and VIVIAN LATIMER TANNIEHILL, *Plaintiffs*, <br><br> v. <br><br> STEVE SIMON, in his official capacity as Secretary of State of Minnesota, *Defendant*, <br><br> DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE, and REPUBLICAN PARTY OF MINNESOTA, *[Proposed] Intervenor-Defendants*. | Case No. 0:20-cv-01205-ECT-TNL |

## [PROPOSED] INTERVENOR-DEFENDANTS'
## NOTICE OF SUPPLEMENTAL AUTHORITY

Earlier today, the Middle District of Louisiana dismissed another case brought by the League of Women Voters against another witness-signature requirement. *See Clark v. Edwards*, No. 20-cv-308-SDD-RLB (M.D. La. June 22, 2020). The court's analysis mirrors the arguments that Proposed Intervenor-Defendants raise here, and confirms that Plaintiffs' claims lack probable merit. Specifically, the court held that voters can find witnesses safely, that in-person voting can be done safely, that threats pertaining to COVID-19 and the November election are too remote and speculative, that COVID-19 is not state action, and that courts should defer to the legislature's judgments about health and safety. The court's opinion is attached.

Dated: June 22, 2020

Respectfully submitted,

_/s/ Cameron T. Norris_

Thomas R. McCarthy (pro hac vice)
Cameron T. Norris (pro hac vice)

Richard G. Morgan
LEWIS BRISBOIS
90 South 7th Street
Suite 2800
Minneapolis, MN 55402
612-428-5000
612-428-5001 (fax)
richard.morgan@lewisbrisbois.com

Jeffrey M. Harris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109

*Counsel for Proposed Intervenor-Defendants Donald J. Trump for President, Inc.,
Republican National Committee, and Republican Party of Minnesota*

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

CLARK, *et al*

CIVIL ACTION

VERSUS

20-308-SDD-RLB

JOHN BEL EDWARDS, *et al*

*consolidated with*

POWER COALITION FOR EQUITY
AND JUSTICE, *et al*

CIVIL ACTION

VERSUS

20-283-SDD-RLB

JOHN BEL EDWARDS, *et al*

**RULING**

Before the Court is the *Motion to Dismiss Plaintiffs' Complaint*[1] filed by Defendant, Louisiana Attorney General Jeff Landry ("the Attorney General"). Plaintiffs, Telisa Clark, Lakeshia Barnett, Crescent City Media Group, League of Women Voters Louisiana, Power Coalition for Equity and Justice, Louisiana State Conference of the NAACP, Jane Chandler, Jennifer Harding, Edith Gee Jones, and Jasmine Pogue (collectively, "Plaintiffs") filed an *Opposition*,[2] to which the Attorney General filed a *Reply*.[3] For the reasons that follow, the Court finds that the *Motion* should be GRANTED.

**I.   FACTUAL AND PROCEDURAL BACKGROUND**

The emergence of the novel coronavirus known as COVID-19 (hereinafter, "the Virus") derailed the state of Louisiana's spring election season. Due to the public health

---

[1] Rec. Doc. No. 35.
[2] Rec. Doc. No. 37.
[3] Rec. Doc. No. 38.
Document Number: 60803

emergency, elections previously scheduled for April 4 and May 9, 2020 were rescheduled by proclamation of Governor John Bel Edwards ("Governor Edwards") to be held on July 11 and August 15, 2020.[4] On April 27, 2020, the Louisiana legislature approved an Emergency Election Plan submitted by Louisiana Secretary of State Kyle Ardoin ("Secretary Ardoin").[5]

This matter began as two separate cases in the Middle District of Louisiana – *Power Coalition v. Edwards* and *Clark v. Edwards* – which were consolidated on June 3, 2020.[6] The consolidated Plaintiffs challenge three aspects of the Emergency Election Plan, as well as certain provisions of Louisiana election law more generally. Plaintiffs' first challenge relates to the fact that, under Louisiana law, absentee by mail voting is limited to voters who satisfy one of fifteen excuses (the "Excuse Requirement").[7] Although the Emergency Election Plan created a COVID-19 Emergency Application allowing voters to request an absentee ballot based on five new Virus-related excuses, Plaintiffs complain that the new excuse categories are overly narrow and, as such, the "Plan fails to protect other categories of voters who need protection"[8] from the Virus.

In addition to the Excuse Requirement, Plaintiffs take issue with what they call the "Witness Requirement." Louisiana law requires a voter using an absentee by mail ballot

---

[4] No. 28 JBE 2020: "Elections – Rescheduled Due to Statewide State of Emergency Caused by COVID-19," (March 13, 2020) (https://gov.louisiana.gov/assets/Proclamations/2020/modified/28-JBE-2020-Special-Elections-COVID19-Postponement.pdf) and No. 46 JBE 2020: "Elections – Rescheduled Due to Statewide State of Emergency Caused by COVID-19," (April 14, 2020) (https://gov.louisiana.gov/assets/Proclamations/2020/modified/46-JBE-2020-Elections.pdf).
[5] "SECRETARY OF STATE EMERGENCY ELECTION PLAN FOR THE JULY 11, 2020 PRESIDENTIAL PREFERENCE PRIMARY AND AUGUST 15, 2020 MUNICIPAL GENERAL ELECTIONS IN THE STATE OF                                                                          LOUISIANA": https://www.sos.la.gov/OurOffice/PublishedDocuments/Revised%20Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-20.pdf
[6] Rec. Doc. No. 17.
[7] *See* La. R.S. § 18:1303.
[8] Rec. Doc. No. 47, ¶ 8.

Document Number: 60803

to "sign the certificate in the presence of one witness."[9] That witness is then required to

sign the absentee by mail ballot envelope flap, which "contain[s] a line for the handwritten

signature of one witness and a line for the printed name of the witness."[10] Plaintiffs

complain that the Emergency Election Plan "leaves in place [this] requirement" and thus

"require[s] voters who qualify to vote by mail and live on their own to risk infection to have

their ballots counted."[11]

Lastly, Plaintiffs argue that the state of Louisiana "fails to provide absentee voters

with notice of defects with their mail-in absentee ballot requests and their mail-in absentee

ballots and deprives them of an opportunity to cure such problems so their votes may be

counted."[12] The ill effects of this so-called "Cure Prohibition" are compounded, Plaintiffs

argue, by the fact that Louisiana "provides no mechanism for tracking whether one's

absentee ballot has been received, accepted, or counted."[13] Since this action was filed,

Defendants have promulgated an emergency rule aimed at providing voters with an

opportunity to cure certain ballot deficiencies.[14] In response, Plaintiffs have withdrawn

from their *Motion for Preliminary Injunction* the claims related to the "Cure Provision."[15]

The "Cure Prohibition" is nevertheless one of the Challenged Provisions in the *Complaint*.

The relief sought by Plaintiffs is severalfold. First, they seek declaratory relief,

beginning with a declaration from this Court that the Excuse Requirement and the Witness

Requirement violate the First and Fourteenth Amendments to the United States

---

[9] La. R. S. § 18:1306(E)(2)(a).
[10] *Id.*
[11] Rec. Doc. No. 47, ¶ 9.
[12] *Id.* at ¶ 10.
[13] *Id.*
[14] Rec. Doc. No. 40.
[15] Rec. Doc. No. 48.

Document Number: 60803

Constitution because those requirements (1) impose undue burdens on the fundamental right to vote and (2) unconstitutionally condition the right to vote upon the forfeiture of the right to bodily integrity.[16] Plaintiffs also seek a declaration that the Excuse and Witness Requirements violate Section 2 of the Voting Rights Act, as well as a declaration that the Cure Prohibition violates the Fourteenth Amendment because it denies certain Plaintiffs their right to procedural due process.[17] Next, Plaintiffs pray for this Court to issue preliminary and permanent injunctions that would, *inter alia*, prohibit Defendants from enforcing the Excuse Requirement and the Witness Requirement for all voters during all Louisiana elections in 2020.[18] Additionally, Plaintiffs want this Court to enjoin Defendants "to provide absentee voters notice and an opportunity to cure any defects in their absentee ballots during, at least, all elections in Louisiana in 2020 that do not require the voter to appear anywhere in person."[19]

The July 11 Louisiana Presidential Preference Primary/Municipal Primary is now less than three weeks away, with early voting already underway and many absentee ballots already distributed.[20] Applications to receive absentee ballots by mail are due by July 7 at 4:30pm. Although a statewide public health emergency remains in effect, Louisiana has taken significant steps toward "reopening" since this action began; when the *Power Coalition Complaint* was filed, Governor John Bel Edwards' stay-at-home order was still in place. That order expired on May 15, 2020. On June 4th, Governor Edwards announced that Louisiana was entering "Phase 2" in the reopening process, which allows

---

[16] Rec. Doc. No. 47, p. 44.
[17] *Id.*
[18] Rec. Doc. No. 47, pp. 45-46.
[19] Rec. Doc. No. 47, p. 46.
[20] Rec. Doc. No. 35-1, p. 5.

Document Number: 60803

4

restaurants, bars, salons, shopping malls, churches, casinos, gyms, and other businesses to operate at 50% capacity, subject to social distancing and other hygiene-related requirements.[21] The Governor's proclamation cautions that "it may be necessary to go back to the full restrictions in the Stay at Home order"[22] if cases of the Virus increase or the capacity of the health care system is threatened. But, as of now, "based upon the advice and expertise of medical experts at the Louisiana Department of Health,"[23] reopening – with precautions – is the reality on the ground. Against this backdrop, Attorney General Jeff Landry now urges the instant *Motion to Dismiss*, arguing that Plaintiffs' claims should be dismissed because they lack standing, they have not adequately alleged state action, and that, because of the proximity of the election, the United States Supreme Court's *Purcell* doctrine instructs this Court to avoid last-minute electoral meddling. The Court will address the arguments in turn.

## II. LAW AND ANALYSIS

### a. The Challenged Provisions and the *Anderson-Burdick* Standard

"Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions."[24] The United States Supreme Court has set forth the following test:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' But when a state election law provision imposes only 'reasonable, nondiscriminatory

---

[21] La. Proclamation Number 74 JBE 2020: "State of Emergency for COVID-19 Phase 2 of Resilient Louisiana," https://gov.louisiana.gov/assets/Proclamations/2020/74-JBE-2020-State-of-Emergency-COVID-19-Resilient-Louisiana-Phase-2.pdf

[22] *Id.*

[23] *Id.*

[24] *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (citing *Storer v. Brown,* 415 U.S. 724, 730 (1974)).

Document Number: 60803

restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions.[25]

The Attorney General suggests that this test is of limited use here because Plaintiffs have failed to identify a burden on their right to vote that relates to the State's action and not to the Virus itself. Plaintiffs "need to show a burden on the right to vote that resulted from some action of the State," he argues. "They have failed to do so because each harm they allege would not exist but for the Virus, a non-state actor."[26]

Plaintiffs correctly note in their *Motion for Preliminary Injunction* that "in general, voters do not have a constitutional right to vote by absentee ballot."[27] Nevertheless, they argue that the burden on Plaintiffs' right to vote due to the Challenged Provisions "is extremely severe" because Plaintiffs "cannot safely vote in person . . . [so] they are effectively disenfranchised."[28] The Supreme Court in *Burdick* stated that "all election regulations[] have an impact on the right to vote."[29] Before delving into the merits question of whether the impact of the Challenged Provisions on Plaintiffs' right to vote is such that it offends the Constitution, this Court is bound to consider the jurisdictional question of Plaintiffs' standing.

b. Motions Under Federal Rule of Civil Procedure 12(b)(1)

"When a motion to dismiss for lack of jurisdiction 'is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before

---

[25] *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal citations omitted).
[26] Rec. Doc. No. 35-1, p. 22.
[27] Rec. Doc. No. 22-1, p. 16 (citing *McDonald v. Bd. Of Election Comm'rs of Chicago*, 394 U.S. 802, 808-809 (1969).
[28] Rec. Doc. No. 22-1, p. 17.
[29] *Burdick,* 504 U.S at 434 (1992).

Document Number: 60803

addressing any attack on the merits.'"[30] "A motion to dismiss under Rule 12(b)(1) is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6)."[31] Therefore, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff.[32] Ultimately, "[t]he burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist."[33]

"Article III standing is a jurisdictional prerequisite."[34] If a plaintiff lacks standing to bring a claim, the Court lacks subject matter jurisdiction over the claim, and dismissal under Rule 12(b)(1) is appropriate.[35] The party seeking to invoke federal jurisdiction bears the burden of showing that standing existed at the time the lawsuit was filed.[36] Article III of the Constitution limits federal courts' jurisdiction to certain "cases" and "controversies." "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[37] "One element of the case-or-controversy requirement" is that

---

[30] *Crenshaw-Logal v. City of Abilene, Texas*, 436 Fed.Appx. 306, 308 (5th Cir. 2011) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see also Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011); Fed.R.Civ.P. 12(h)(3)).

[31] *Wagster v. Gautreaux*, 2014 WL 3546997, at *1 (M.D. La. July 16, 2014) (quoting *Hall v. Louisiana, et al*, 974 F.Supp.2d 978, 985 (M.D. La. Sept. 30, 2013)) (citing *Benton v. U.S.*, 960 F.2d 19, 21 (5th Cir. 1992)).

[32] *Lewis v. Brown*, 2015 WL 803124, at *3 (M.D. La. Feb. 25, 2015).

[33] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citations omitted).

[34] *Crenshaw-Logal*, 436 Fed.Appx. at 308 (citing *Steel Co.*, 523 U.S. at 101, 118 S.Ct. 1003, and *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir. 1989)).

[35] *Whitmore v. Arkansas*, 495 U.S. 149, 154-55, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507, 509 (5th Cir. 1997).

[36] *M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *Ramming*, 281 F.3d at 161.

[37] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (internal quotation marks omitted); *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (internal quotation marks omitted); *see, e.g., Summers v. Earth Island Institute*, 555 U.S. 488, 492-493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009).

Document Number: 60803

7

plaintiffs "must establish that they have standing to sue."[38] The United States Supreme

Court has held that "the irreducible constitutional minimum of standing contains three

elements"[39]:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a
> legally protected interest which is (a) concrete and particularized, and (b)
> actual or imminent, not conjectural or hypothetical. Second, there must be
> a causal connection between the injury and the conduct complained of—
> the injury has to be fairly traceable to the challenged action of the defendant,
> and not the result of the independent action of some third party not before
> the court. Third, it must be likely, as opposed to merely speculative, that the
> injury will be redressed by a favorable decision.[40]

To establish Article III standing, an injury must be "concrete, particularized, and

actual or imminent."[41] A particularized injury is one which "affect[s] the plaintiff in a

personal and individual way."[42] "Although 'imminence' is concededly a somewhat elastic

concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged

injury is not too speculative for Article III purposes—that the injury is *certainly*

impending."[43] "Allegations of *possible* future injury"[44] do not suffice.

The Court will not spill ink expounding on the centrality of the right to vote, which

is unquestionably "of the most fundamental significance under our constitutional

structure."[45] The 12(b)(1) question raised by the Attorney General's *Motion* is whether

Plaintiffs have articulated an "injury" to that right that is sufficient to support Article III

---

[38] *Raines,* 521 U.S. at 818, 117 S.Ct. 2312; *see also Summers,* 555 U.S. at 492-493, 129 S.Ct. 1142;
*DaimlerChrysler Corp.,* 521 U.S. at 342, 126 S.Ct. 1854; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560,
112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

[39] *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992).

[40] *Id.* (internal citations and quotations omitted).

[41] *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, —— (2010).

[42] *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560,
and n. 1 (1992).

[43] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).

[44] *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990).

[45] *Burdick*, 504 U.S. at 433 (1992)(quoting *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173,
184 (1979)).

Document Number: 60803

standing. In the Attorney General's view, Plaintiffs' alleged injury is not "actual or imminent"[46] because the risk of "possibly coming in contact with the Virus through the act of physically voting or by having a third party sign their absentee ballot as a witness"[47] is a harm far too hypothetical to be an "injury-in-fact" to under the doctrine.

Plaintiffs contend that the Attorney General misunderstands their argument. The alleged injury-in-fact is not potential exposure to the Virus, they explain, but rather the fact that they are "forced to comply with the challenged requirements"[48] of state voting procedure. But, Plaintiffs' cited reason for objecting to those requirements is that the requirements force upon them a choice: to "violate social distancing guidance or face disenfranchisement."[49] In other words, Plaintiffs simultaneously argue that risk of exposure to the Virus is not their alleged injury-in-fact and that the State's voting procedures are unconstitutional because they force Plaintiffs to risk exposure to the Virus (by violating social distancing guidance). This strikes the Court as a difficult needle to thread. The risk presented by the Virus is the *raison d'etre* of Plaintiffs' lawsuit; however sliced, Plaintiffs' alleged injury is inextricable from that risk.

The analysis cannot proceed without acknowledging *Purcell*, the Supreme Court doctrine that applies to cases like this one, where Plaintiffs seek broad declaratory and injunctive relief related to a series of elections, the soonest of which is already open for early voting.[50] In *Purcell v. Gonzalez*, the Supreme Court held that courts in cases like

---

[46] Rec. Doc. No. 35-1, p. 8 (quoting *Clapper*, 568 U.S. at 409).

[47] Rec. Doc. No. 35-1, p.9.

[48] Rec. Doc. No. 36, p. 3, n. 3.

[49] *Id.*

[50] Although the August, November, and December elections are less imminent than the July 11 election, the Court is mindful that, as the Attorney General notes, "the post-election calendar of required events for the July 11 election have a cascading effect on the August run-off elections." (Rec. Doc. No. 35-1, p. 5).

this are bound to "weigh . . . considerations specific to election cases."[51] Those considerations include the possibility that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."[52] The *Purcell* doctrine has been invoked in recent election cases that featured claims related to the Virus's impact on voting. In *Republican Nat'l Comm. v. Democratic Nat'l Comm*,[53] the Supreme Court granted an application for stay of the lower court's preliminary injunction, which had required Wisconsin election officials to count absentee ballots that were postmarked after election day. Explaining its reasons for the stay, the Court explained that it "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."[54] And, in *Texas Democratic Party v. Abbott*, the Fifth Circuit noted that the *Purcell* doctrine is especially important in situations "where, as here, ... local officials are actively shaping their response to changing facts on the ground."[55]

The *Purcell* doctrine does not command judicial abstention in late-breaking election cases, and this Court does not suggest that *Purcell* alone would provide a reason to dismiss Plaintiffs' claims. But *Purcell* clearly instructs that a court considering significant judicial intervention "on the eve of an election"[56] is to proceed with caution, recognizing that, in the words of the Supreme Court, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms."[57]

---

[51] *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).
[52] *Id.* at 4-5.
[53] 140 S. Ct. 1205, 1207 (2020).
[54] *Id.*
[55] *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *16 (5th Cir. June 4, 2020) (quoting *S. Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613 (2020)).
[56] *Republican Nat'l Comm.,* 140 S. Ct. 1205, 1207 (2020).
[57] *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997).

The intervention-shy spirit of *Purcell* is echoed in the underpinnings of Article III standing doctrine. Indeed, "[t]he law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."[58] Under the United States Constitution Article I, § 4, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Thus, this Court undertakes the standing analysis in this case with particular rigor, knowing that to justify potentially disruptive judicial intervention, the existence of an Article III case or controversy is especially vital. The injury-in-fact element is best assessed by reference to the specific Plaintiffs in this matter, each of whom asserts a different type of injury, arising out of a different set of circumstances.

<u>INDIVIDUAL PLAINTIFFS</u>

> 1) <u>Plaintiff Jane Chandler</u>

Jane Chandler is 76 years old and thus qualifies to receive an absentee ballot, even under non-Emergency Election Plan voting procedures (pre-Virus Louisiana election law provides that registered voters 65 years of age and older may vote by mail).[59] As such, she can demonstrate no injury-in-fact with respect to the Excuse Requirement. Her alleged injury centers around the Witness Requirement; Plaintiffs avers that she has a "lung condition"[60] that places her at higher risk and that she "does not know how she will be able to safely and efficiently obtain a witness signature for her ballot envelope without defying the predominant health guidance to maintain isolation."[61] But is the

---

[58] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).
[59] La. R.S. §18:1303(J).
[60] Rec. Doc. No. 49, p. 10.
[61] *Id.*

Document Number: 60803

predominant health guidance really "to maintain isolation"? According to Governor Edwards' recent Proclamation regarding Phase 2 of Louisiana's reopening, that condition would qualify Chandler as "higher-risk," based on guidance issued by the Centers for Disease Control and Prevention.[62] For higher-risk individuals, the Governor reports the advice of "medical experts at the Louisiana Department of Health"[63] as follows:

> All individuals who are at higher risk of severe illness from COVID-19 should stay at home, unless travelling outside the home for an essential activity, such as: 1) Obtaining food, medicine, and other similar goods necessary for the individual or a family member of the individual. 2) Obtaining medical care and treatment and other similar vital services for an individual or a family member of the individual. 3) Going to and from an individual's workplace. 4) Going to and from the home of a family member. 5) Going to and from an individual's place of worship. 6) Engaging in outdoor activity, provided individuals maintain a distance of six feet from one another.[64]

The Governor and his health experts do recommend that higher-risk individuals "stay at home," but they also enumerate six "essential activities" as exceptions to that general rule. Indeed, Chandler notes that she has left home "for limited purposes, such as a doctor's appointment, and has maintained social distancing best practices while out."[65] Yet, she asserts that she is suffering injury because she "does not know how she will be able to safely and efficiently obtain a witness signature for her ballot envelope without defying the predominant health guidance to maintain isolation."[66] Presumably, the same

---

[62] The Governor's Proclamation states: "Those individuals who are at higher risk of severe illness, as designated by the Centers for Disease Control (CDC), are those with conditions such as asthma, chronic lung disease, compromised immune systems (including from smoking, cancer treatment, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, or use of corticosteroids or other immune weakening medications), diabetes, serious heart disease (including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and hypertension), chronic kidney disease undergoing dialysis, liver disease, or severe obesity or those who are 65 or older or living in a nursing home or long-term care facility."

[63] https://gov.louisiana.gov/assets/Proclamations/2020/74-JBE-2020-State-of-Emergency-COVID-19-Resilient-Louisiana-Phase-2.pdf

[64] *Id.*

[65] Rec. Doc. No. 49, p. 10.

[66] *Id.*

Document Number: 60803

"best practices" that Chandler employed during her limited outings could be used to ensure her safety during the brief interaction necessary to obtain a witness signature on her ballot. The District Court for the Western District of Wisconsin has suggested various ways in which a witness signature could be obtained while maintaining social distancing:

> . . . a friend or neighbor may watch the voter mark their ballot through a window, open door or other physical barrier, and even may do so by video chat, like Skype or Facetime, with the voter then placing the ballot outside for the witness to sign and mail . . . [or] the voter could ask an individual delivering groceries or food to witness the ballot.[67]

In fact, Chandler has already "arranged to have her groceries and other necessities dropped off"[68] at her home. This Court does not dismiss the risks associated with the Virus, nor belittle the concerns of voters like Chandler. But if, as Plaintiffs argue, the relevant injury is being forced to violate social distancing guidelines in order to vote absentee, the Court humbly disagrees that Chandler is actually forced to so. Chandler can get a witness signature on her absentee ballot without violating those guidelines by taking the same precautions she takes when leaving her home for doctor's appointments and other "limited purposes."[69]

Chandler's alleged injury is reminiscent of the injury asserted in *Clapper v. Amnesty International USA*.[70] In *Clapper*, a group of "attorneys and human rights, labor, legal, and media organizations whose work allegedly requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, sources, and other individuals located abroad"[71] challenged a provision of the Foreign

---

[67] *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1638374, at *6 (W.D. Wis. Apr. 2, 2020).
[68] Rec. Doc. No. 49, p. 10.
[69] *Id.*
[70] 586 U.S. 398 (2013).
[71] *Id.* at 406.

Intelligence Surveillance Act that allowed the American government "to acquire foreign intelligence information by jointly authorizing the surveillance of individuals who are not 'United States persons' and are reasonably believed to be located outside the United States."[72] Plaintiffs asserted that, because of the nature of their work, "there is an objectively reasonable likelihood that their communications with their foreign contacts will be intercepted under [the provision] at some point in the future."[73]

The United States Supreme Court held that such an injury was insufficient to establish Article III standing because it involved a "highly attenuated chain of possibilities, [and thus] does not satisfy the requirement that threatened injury must be certainly impending."[74] Plaintiffs' asserted injury, the Court explained, involved multiple layers of assumptions – that the Government would target non-U.S. persons with whom the plaintiffs communicated; that the Government would do so by invoking the authority in the challenged provision and not some other method of surveillance; and that the Government would successfully intercept plaintiffs' communications.

Although the chain of possibilities involved in Plaintiff Chandler obtaining a witness signature for her absentee ballot is admittedly not so extensive as the chain of possibilities in an international surveillance operation, the *Clapper* Court's point nevertheless applies. The injury asserted by Chandler is that, in light of the Virus, complying with the Witness Requirement will cause her to compromise her safety. But for Chandler's safety to be compromised while obtaining a witness signature, quite a few things would have to go wrong. First, she would have to choose a method of obtaining a signature that involved

---

[72] *Id.* at 401.
[73] *Id.* at 410.
[74] *Clapper*, 568 U.S. at 410.

Document Number: 60803

14

in-person contact, which, as described above, is not necessary. Second, if in-person contact did occur, she would have to take no precautions in the form of maintaining social distance, using personal protective equipment, hand sanitizer, and so on. Chandler admits that she "has maintained social distancing best practices while out,"[75] and has not asserted that she would be unable to do so while obtaining a witness signature. Third, the person that Chandler selected to witness her ballot would actually have to be carrying the Virus. The risk is not zero, but it is highly speculative. Ultimately, Chandler would have to comply with the Witness Requirement to vote by mail whether the Virus existed or not. Thus, the gravamen of her asserted injury is fear of exposure to the Virus. Such fear is simply not enough to give rise to a "certainly impending" injury. The instructions of Governor Edwards in his most recent Proclamation make clear that, by taking precautions, even "higher-risk" individuals can safely make contact with others.

## 2) Plaintiff Edith Gee Jones

As a 65-year-old New Orleans resident, Louisiana law enables Edith Gee Jones, like Plaintiff Chandler, to vote by mail even pre-Virus. Obtaining a witness signature on her absentee ballot would present no obstacle, as Ms. Jones lives with her husband. Her alleged injury arises out of her desire "to continue her tradition of voting in person."[76] Jones plans to take advantage of the state's expanded early voting period, since during early voting "her polling site has typically been less crowded than on election days."[77] This is all well and good. But the Court fails to see how these allegations amount to any colorable injury, when Louisiana law already provides for a period of early voting, to run

---

[75] Rec. Doc. No. 49, p. 10.
[76] *Id.* at p. 12.
[77] *Id.*

Document Number: 60803

"from fourteen days until seven days prior to any scheduled election,"[78] and the Emergency Election Plan *expands* the early voting period from seven days to thirteen days for the July 11, 2020 and August 15, 2020 elections,[79] providing Jones with five additional days on which she may vote early. At best, Plaintiff Jones' alleged injury can be construed as arising out of the fact that the expanded early voting period in the Emergency Election Plan has not yet been put in place for Louisiana's fall election season. But that is an injury far too speculative and remote to grant her standing. Jones cannot reasonably assert an injury to her right to vote based on requirements that may or may not be in place in their current form for the November and December elections. Jones wants to vote early, and the law permits her to do so. The Court sees no injury to her right to vote.

3) <u>Plaintiff Jennifer Harding</u>

Jennifer Harding lives in Baton Rouge with her husband and her son. She would like to vote by absentee ballot "to decrease her risk of virus exposure at her polling station," in part because she has part-time "parental care responsibilities" for her 72-year-old father, 71-year-old mother, and 93-year-old grandmother, all of whom have significant health issues. Harding has not requested an absentee by mail ballot because "she does not believe the Emergency Plan absentee ballot application permits her, or others similarly situated in part-time eldercare roles, to request a ballot without exposure to the risk of criminal penalty."[80]

---

[78] La. R.S. § 18:1309(A)(1)(a)i.
[79] https://www.sos.la.gov/OurOffice/PublishedDocuments/Revised%20Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-20.pdf
[80] Rec. Doc. No. 49, p. 11.
Document Number: 60803

16

The "COVID-19 Emergency Application" prepared by the Secretary of State allows an applicant to attest that she is unable to vote in person because she is "Caring for an individual . . . who is subject to a medically necessary quarantine or isolation order as a result of COVID-19 or who has been advised by a health care provider to self-quarantine due to COVID-19 concerns."[81] The excuse as written is not conditioned upon having only live-in or full-time care responsibilities. It is true, as the application states, that providing a false statement on the ballot application is a felony offense, but the Court fails to see why Harding would be subject to a penalty for making a false statement when she clearly alleges that she has significant elder care responsibilities, and the Secretary of State's form does not inquire as to the "live-in" or "full-time" nature of those responsibilities. The ballot application states that a penalty attaches to "knowingly making false statements;"[82] as Harding avers that she does not know whether she meets the criteria, her attestation that she needs to vote absentee because she is "caring for an individual. . ."[83] would not be knowingly false.

The Court is sensitive to the fact that Harding and other would-be absentee voters are not attorneys and may be uneasy about the potential criminal penalty because of certain unclear language on the ballot application. Nevertheless, Harding's own belief that she would not qualify based on the Secretary of State's criteria is apparently entirely speculative and not sufficiently concrete to give rise to an injury-in-fact. Even assuming that Harding would not qualify, for the same reasons described above with respect to Ms. Chandler, the notion that the Excuse Requirement forces Harding to "jeopardiz[e] her

---

[81] https://www.sos.la.gov/OurOffice/PublishedDocuments/COVID-19%20VR2%20Absentee%20by%20Mail%20Application%20(Rev.%204-20)%20Ver.%201.pdf
[82] *Id.*
[83] *Id.*

health and the health of her family and community by voting in person"[84] is a conclusion that requires quite a few assumptions. Harding prefers to vote by absentee ballot due to the Virus, and the state's expanded Virus-related excuses appear to accommodate that preference. She cannot make out a claim of injury-in-fact by assuming that she *does not* qualify to vote absentee and then asserting, contra the Governor's guidance, that voting in person automatically poses a mortal risk. The Court is sympathetic to Harding's concerns, but, as the Fifth Circuit put it in *Texas Democratic Party v. Abbott*,

> The Constitution is not offended simply because some groups find voting more convenient than do the plaintiffs because of a state's mail-in ballot rules. That is true even where voting in person may be extremely difficult, if not practically impossible, because of circumstances beyond the state's control, such as the presence of the Virus.[85]

### 4) Plaintiff Jasmine Pogue

Like Plaintiff Harding, *supra*, Jasmine Pogue's alleged injury arises out of her own belief that she does not qualify to vote absentee by mail under the Secretary of State's Emergency Election Plan criteria. Pogue alleges that she suffers from asthma and has a history of upper respiratory infections, including one in mid-March of this year. Her asthma attacks leave her with "severe difficulty breathing."[86] Despite this, she "does not believe that her asthma qualifies as 'moderate or severe'": the COVID-19 Emergency Application lists "moderate to severe asthma" as an example of the conditions that place an individual at higher risk due to the Virus and, therefore, qualify him or her for an absentee ballot.

---

[84] Rec. Doc. No. 49, p. 11.
[85] *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *11 (5th Cir. June 4, 2020) (internal citations and quotations omitted).
[86] Rec. Doc. No. 49, p. 12.

Pogue, based on her own belief that her asthma is not moderate to severe, "does not believe that she qualifies to apply for an absentee ballot."[87]

The Court admires Pogue's desire to be cautious when filling out the ballot application. But her alleged injury – being forced to vote in person because she does not fulfill any of the excuses provided – is speculative. She did not apply; her application was not rejected. Additionally, it seems to the Court that, based on her asthma and history of respiratory infections, Pogue qualifies for an absentee ballot on the basis of "chronic lung disease," which is one of the explicitly enumerated qualifying conditions. Or, since she fears that voting "would pose severe and potentially fatal risk to her health,"[88] Pogue could discuss her desire to self-quarantine with a health care provider; if they agreed it was a wise measure, Pogue could with clear conscience check the box on the ballot application for individuals who have been "advised by a health care provider to self-quarantine." As it stands, Pogue's alleged injury is hypothetical. It assumes that she does not meet any of the provided excuse criteria and that, if she applied, her application would be rejected.

5) Telisa Clark[89]

Plaintiff Telisa Clark qualifies to vote absentee by mail under the Emergency Election Plan because she suffers from hypertension and other serious heart conditions. So, the Excuse Requirement presents no obstacle to Clark exercising her right to vote; nor does the Witness Requirement, because Clark lives with several family members and would not have to seek a witness outside the home. Clark's alleged injury relates to the November and December elections, for which no Emergency Election Plan has yet been

---

[87] *Id.*

[88] *Id.*

[89] Plaintiffs have moved to amend Ms. Clark's declaration (See Rec. Doc. No 68), but the proposed amendments do not affect the analysis herein.

Document Number: 60803

put in place. Plaintiffs allege that, for those future elections, Clark "does not qualify to request an absentee ballot and must choose between voting in person – risking her health and the health of her family – and not voting at all."[90] This allegation assumes that the Emergency Election Plan will not be extended to apply for the November and December election. It is as yet unknown what procedures will govern those elections. It is premature, speculative, and insufficiently concrete for Clark to assert an injury-in-fact based on requirements that may or may not be in place in the future. Governor Edwards and Secretary of State Ardoin have certified states of emergency and implemented changes – in the form of gubernatorial Proclamations and the Emergency Election Plan – in response to the evolving Virus situation. Until Clark can articulate a concrete, imminent injury based on an actual state policy, her claims present no injury-in-fact sufficient to support a finding of Article III standing.

### 6) Plaintiff Lakeshia Barnett

Lakeshia Barnett is the daughter of co-Plaintiff Telisa Clark. She resides with her parents and several other family members, all of whom suffer from health conditions that qualify them to vote absentee under the Emergency Election Plan. Barnett herself, however, "understands that she needs an excuse to qualify for an absentee ballot in Louisiana and that she does not qualify for any excuse under Louisiana law."[91] Assuming *arguendo* that Barnett is correct in her assessment that she could not qualify to vote absentee by mail, the Court acknowledges that she would then be required to vote in

---

[90] Rec. Doc. No. 47, p. 9.
[91] Rec. Doc. No. 47, p. 10.

Document Number: 60803

person. Per Barnett, voting in person means that she "would have to choose between her vote and her family's health."[92]

The Court finds that this form of injury – alleged by several Plaintiffs – is hypothetical and speculative. Like Plaintiff Chandler, Ms. Barnett's alleged injury is dependent on "highly attenuated chain of possibilities, [and thus] does not satisfy the requirement that threatened injury must be certainly impending."[93] A number of circumstances would have to coalesce in order for Barnett's health to be jeopardized by exercising her right to vote. Her injury becomes manifest if she confronts a crowded polling place (and does not take advantage of early voting when the polls are less crowded), social distancing and personal protective equipment fails to ameliorate the risk, and she comes into contact with an infected person and she transmits the Virus to her family.  This "chain of possibilities" is further complicated by Barnett's attestation that she is employed by the United States Postal Service and explains that at her job, she "rarely interacts with members of the public and always wears protective gear."[94] Barnett fails to explain how those same precautions would fail to protect her when she votes in person. The Emergency Election Plan allows Barnett to take advantage of early voting to minimize human interaction, and the Plan sets forth a bevy of measures to be employed at polling places, including hand sanitizer, gloves, masks, tape and cones to mark 6-foot social distancing intervals, and disinfectant wipes to clean each voting machine, pen, pencil, and voter card between voters.[95] Barnett's assumption that she would be forced to violate

---

[92] *Id.*
[93] Note 72, *supra*
[94] *Id.* at p. 9.
[95] https://www.sos.la.gov/OurOffice/PublishedDocuments/Revised%20Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-20.pdf.

Document Number: 60803

21

social distancing guidelines and risk infection with the Virus in order to vote in person is just that: an assumption. While her own fears for her health and the health of her family are undoubtedly quite real, Article III standing doctrine is quite clear: "[a]llegations of possible future injury"[96] are not sufficient. Moreover, Barnett's alleged injury is not sufficiently particularized; undoubtedly many voters who continue to work in public-facing occupations during the Virus have concerns about the effect on their health and the health of their families. That concern does not "affect[] the plaintiff in a personal and individual way;"[97] navigating how to safely appear in public against the backdrop of the Virus is the new normal for all Americans.

The public health emergency caused by the Virus is by no means over. But, according to Governor Edwards, whose Proclamations are issued based on advice from state public health experts and the Centers for Disease Control, the conditions on the ground are sufficiently safe for even higher-risk individuals to travel to and from work, attend church, visit the doctor, the grocery store, and family members' homes, provided that they take appropriate precautions and exercise social distancing.[98] In light of the public health emergency, the Secretary of State has promulgated an Emergency Election Plan that almost doubles the length of the early voting period, creates five new Virus-related excuses for absentee by mail voting, and implements strict disinfection and social distancing plans at polling places. Plaintiffs strenuously assert that their alleged injury is not merely fear of exposure to the Virus – likely because they know that such an argument does not pass constitutional muster. But, examining the claims of each Plaintiff, to the

---

[96] *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990).
[97] *Gill v. Whitford,* 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, and n. 1 (1992)).
[98] See above.

Document Number: 60803

extent they articulate a potential injury at all, that injury is inextricably bound up in fear of exposure to the Virus. Plaintiffs instead characterize their injury as "the immediate impairment of the right to vote in the context of the objective danger created by the pandemic."[99] However, they fail to adequately allege that there has been, or will be, an impairment of the right to vote attributable to State action. Based on the allegations in the *Complaint*, two of the six individual Plaintiffs face no obstacle to voting absentee by mail in the July and August elections but claim injury based on their supposition that they *might* not be able to do the same in the scheduled November and December elections. Another Plaintiff claims injury based on the Witness Requirement but fails to allege how that requirement represents an "immediate impairment" to her right to vote; by her own admission, she has made "limited outings" while taking precautions, and she could do the same to obtain a witness signature. The other three Plaintiffs allege that the Excuse Requirement presents an impairment to their right to vote because they do not qualify and thus must vote in person, which they prefer not to do. Plaintiffs' own "beliefs" that they do not qualify for mail ballots are speculative, since all three appear to at least arguably qualify under one of the excuses provided on the ballot application. And, in any event, they fail to allege how voting in person represents an "impairment" of their right to vote. The potential presence of the Virus in their polling place is not a legal impairment of their right; it is an epidemiological reality to which state officials have responded, not by impairing voting rights, but by expanding them. Some of the Plaintiffs here appear to have "fallen through the cracks" in the emergency ballot application. They feel that they should qualify, but either because they have concluded that their health conditions are not

---

[99] Rec. Doc. No. 36, p. 6.

Document Number: 60803

serious enough to qualify them based on their diagnosis or upon the advice of their doctor, or because none of the categories on the ballot application captures with 100% accuracy the reason for their desire to vote absentee by mail, they have not filled out the application.

Even assuming that they *would not* qualify if they applied, Plaintiffs' desire to avoid their polling place because of their fear – however legitimate -- that they would be exposed to the Virus is simply not an injury-in-fact. The Governor, based on the advice of state medical officials and the Centers for Disease Control, has authorized even higher-risk individuals to leave home, taking precautions, for activities like work and church. The Secretary of State, in concert with the legislature and the Governor, has promulgated an Emergency Election Plan that expands the availability of social-distancing-compliant avenues for voting, including early voting and voting by mail. Moreover, the Emergency Election Plan provides for the implementation of social distancing, personal protective equipment, and disinfection protocols at polling places. Thus, the Court rejects Plaintiffs' contention that they are being "forced to choose" between their health and voting. After accounting for the state's expansion of voting opportunities and the realistic level of risk on the ground, as described by Governor Edwards, Plaintiffs' alleged injury can be only fear of the risk of exposure to the Virus. In a state with 2.9 million registered voters[100] and 48,634 confirmed cases of the Virus,[101] the "chain of possibilities"[102] is too remote – not certainly impending – and speculative.

This holding should not be construed as minimizing or deriding Plaintiffs' fear of the Virus, which is a very legitimate public health concern. However, in a situation where

---

[100] Rec. Doc. No. 61, p. 2 (*Parties' Joint Stipulation as to the Admission of Certain Facts*).
[101] *Id.*
[102] *Clapper*, 568 U.S. at 410.

Document Number: 60803

judicial intervention is disfavored as a matter of law, and the state authorities, to whom

the Constitution delegates the authority to determine the "Times, Places, and Manner"[103]

of elections, have undertaken a Virus-related *expansion* of voting opportunities, this Court

finds that Plaintiffs have not plausibly alleged an injury to their right to vote.

<u>ORGANIZATIONAL PLAINTIFFS</u>

Not all of the Plaintiffs are individuals. Four nonprofit organizations – Crescent City

Media Group, the League of Women Voters Louisiana, Power Coalition for Equity and

Justice, and the Louisiana State Conference of the NAACP – join this action and must

likewise demonstrate standing under Article III. An organization "can establish standing

in its own name if it meets the same standing test that applies to individuals."[104] So, the

organizational Plaintiffs must demonstrate the same "injury-in-fact," required for the

above-discussed individual Plaintiffs, as well as show that the injury-in-fact is fairly

traceable to, and redressable by, Defendants. The Fifth Circuit has held that "[n]onprofit

organizations can suffer an Article III injury when a defendant's actions frustrate their

missions and force them to "divert significant resources to counteract the defendant's

conduct."[105] Organizational standing based on resource diversion arises when "the

defendant's conduct significantly and 'perceptibly impaired' the organization's ability to

provide its "'activities—with the consequent drain on the organization's resources...' Such

injury must be "concrete and demonstrable."[106] In the *Complaints*, all four organizational

Plaintiffs assert standing based on their diversion of resources and the frustration of their

---

[103] Article I, § 4.

[104] *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).

[105] *N.A.A.C.P. v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir. 2010).

[106] *N.A.A.C.P.*, 626 F.3d at 238 (5th Cir. 2010).

Document Number: 60803

missions. "Not every diversion of resources to counteract the defendant's conduct, however, establishes an injury in fact."[107]

### 1) Power Coalition for Equity and Justice

Power Coalition for Equity and Justice ("Power Coalition") describes itself as a "nonpartisan, nonprofit statewide civic engagement table in Louisiana that works to build grassroots power, advocate for community-centered policies, and increase voter participation."[108] In 2019, Power Coalition's voting-related efforts included over 1.2 million "contact attempts" in the form of door knocks, phone calls, and text messages to "infrequent and semi-frequent voters of color."[109] Power Coalition also "routinely provides rides to the polls and rapid response voter support on Election Days."[110]

Power Coalition reports that, "[s]ince the COVID-19 pandemic began," it has been forced to shift to "virtual engagement models" and to dedicate time to "monitoring and responding to each iteration of Louisiana's Emergency Plan."[111] If the Challenged Provisions are not enjoined by this Court, Power Coalition alleges that it "anticipates diverting resources to train volunteers and educate voters on the limitations of these measures [and] expects to receive an influx of requests for rides to the polls or assistance obtaining a witness signature in advance of Election Day, and recurring questions about how to adhere to social distancing guidance while attempting to vote in person or in the presence of a signatory."[112]

---

[107] *Id.*
[108] Rec. Doc. No. 49, p. 9.
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.*

Document Number: 60803

As an initial matter, the Court does not find that Power Coalition has alleged a significant diversion of resources. By their own allegations, they have a strong voting-related mission, including offering rides to the polls and voter support. The fact that they anticipate demand for those services does not strike the Court as an injury, nor does the fact that they undertook to monitor developments in Louisiana election law; that activity seems consistent with their general activities and mission. *In NAACP v. City of Kyle, Tex.,* the Fifth Circuit found that the Home Builders Association of Greater Austin did not have organizational standing in a Fair Housing Act case where it alleged injury based on a new city housing ordinance because the HBA had "not explained how the activities [it undertook in response to the ordinance], which basically boil down to examining and communicating about developments in local zoning and subdivision ordinances, differ from the HBA's routine lobbying activities."[113] Likewise here. In *OCA-Greater Houston v. Texas*, the Fifth Circuit distinguished *NAACP v. City of Kyle*, explaining that an organization that "went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction"[114] had organizational standing. The Court simply does not see how Power Coalition has "gone out of its way" in response to the actions of Defendants. This is especially true because the Challenged Provisions were already part of Louisiana law and thus, the organization cannot claim to be expending resources to research, understand, and educate the public on new laws. The expanded ballot excuses related to the Virus are new, of course, but again, the Court is unpersuaded that

---

[113] *N.A.A.C.P.,* 626 F.3d at 238 (5th Cir. 2010).
[114] *OCA-Greater Houston*, 867 F.3d at 612 (5th Cir. 2017).

Document Number: 60803

conducting voter education on those excuses is "out of the way" for an organization with a self-described mission to "increase voter participation."[115]

Even assuming that Power Coalition *had* alleged an injury, that injury is traceable to the Virus, not to the State actions of Defendants. The pandemic has wreaked havoc on many aspects of society – courts, schools, businesses, churches, and almost every conceivable organization has shifted its operations and spent money in response to the Virus. In that sense, the Virus's manifold effects on society are an injury that is "plainly undifferentiated and 'common to all members of the public.'"[116] So, Power Coalition (and the other organizational Plaintiffs) has not articulated a *particularized* injury. In any event, the fact that Power Coalition's voting activities are now partly Virus-related (i.e. fielding questions about social distancing and Virus-related ballot excuses) is not fairly traceable to Defendants. And it would be a stretch for Power Coalition to argue that the state's actions – which, after all, expanded early voting and access to absentee by mail voting – somehow frustrates their mission of "increas[ing] voter participation."[117] The Court does not deny that the Virus has thrown a wrench into Power Coalition's normal operations, but even assuming *arguendo* that sufficient injury has been alleged, that injury is not fairly traceable to the conduct of Defendants.

2) Louisiana State Conference of the NAACP

The Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP") has a membership that "includes Black voters residing throughout Louisiana."[118] The Louisiana NAACP's work "includes efforts to

---

[115] Rec. Doc. No. 49, p. 9.
[116] *United States v. Richardson*, 418 U.S. 166, 177 (1974).
[117] Rec. Doc. No. 49, p. 9.
[118] Rec. Doc. No. 49, p. 10.

register, educate, and advocate on behalf of Black voters throughout Louisiana" in support of its mission, which focuses on "eliminating racial discrimination in the democratic process and ensuring the protection of voting rights and equitable political representation."[119] The Louisiana NAACP alleges that, "[a]s a direct result of the Challenged Provisions, the Louisiana NAACP has diverted its limited resources to monitor and investigate the impact of the Challenged Provisions on its members, and has advocated for a modified Emergency Plan that considers the significant impact of the COVID-19 pandemic on Black Louisianans. . ."[120] Again the Court is unpersuaded that these activities represent a significant diversion of resources away from the Louisiana NAACP's mission of "ensuring the protection of voting rights".[121] And, assuming that this alleged diversion of resources suffices to show Article III injury, that injury is traceable to the Virus, not Defendants. The Challenged Provisions were part of Louisiana election law pre-Virus. To the extent those provisions impact the Louisiana NAACP and its members differently now, it is due to the Virus and its attendant upheaval.

 3) <u>League of Women Voters Louisiana</u>

  The League of Women Voters Louisiana ("LWVLA") is a "nonpartisan, not-for-profit corporation" that seeks to "ensure a strong, active, and participatory democracy for all voters,"[122] "particularly those from traditionally underrepresented or underserved communities."[123] LWVLA asserts that, "[b]ecause of the restrictions on absentee ballots under Louisiana law during the COVID-19 pandemic, [it] has been forced to divert time

---

[119] *Id.*
[120] *Id.*
[121] Note 115, *supra.*
[122] Rec. Doc. No. 47, p. 12.
[123] *Id.*

Document Number: 60803

29

and resources away from its regular activities."[124] As an initial matter, the Court notes that there are actually fewer "restrictions on absentee ballots" during the pandemic than there are under normal, pre-Virus Louisiana election law. Nevertheless, LWVLA explains that they are compelled to conduct public education on the "complicated and vague Excuse Requirement" in the Emergency Election Plan, as well as to advise voters on how to "stay safe while complying with the law and voting."[125] Confusingly, LWVLA alleges that these Virus-related activities will prevent them from engaging in the following LWVLA efforts: "voter registration efforts, education around the 2020 Census and redistricting, and 'Get Out the Vote' efforts during the 2020 election cycle."[126] The Court fails to see how the Virus-related changes represent a significant diversion of resources from LWVLA's planned mission. Based on LWVLA's own allegations, it will spend the Louisiana election season engaged in voter education, voter outreach, and advocacy. The fact that the content of that education and outreach is now related to the Emergency Election Plan is not enough to demonstrate an injury-in-fact. Assuming *arguendo* that injury has been demonstrated, that injury is nevertheless squarely traceable to the global pandemic, not to the actions of Defendants. To hold otherwise would be to hold than any change in state election law gave nonprofit organizations like the LWVLA standing to sue, simply because they were forced to incorporate the new legal landscape into their education and outreach efforts. That cannot be true. In any event, the Emergency Election Plan e*xpands* voting opportunities; the LWVLA cannot argue that it was forced to divert resources "to counteract the defendant's conduct"[127] when LWVLA defines it mission as seeking to

---

[124] *Id.*

[125] Rec. Doc. No. 47, p. 12.

[126] *Id.*

[127] *N.A.A.C.P. v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir. 2010).

Document Number: 60803

ensure that all voters "have the opportunity and the information to exercise their right to vote."[128] The same could be said for all of the organizational Plaintiffs. Injury does not arise because of their desire or preference for a different scheme of absentee by mail voting, nor because they adjust their organization's activities in response to the Virus and the Virus-related changes to the law. The law is not static. It cannot follow that every change in voting laws that causes voting advocacy groups to 'check and adjust' is an injury.

Other courts have held to the contrary in similar cases. For example, in *Fair Fight Action, Inc., v. Raffensperger*,[129] the District Court for the Northern District of Georgia considered whether organizational standing existed where several nonprofit organizations that "have promoting voting and voter education as part of their missions. . . each allege that they have had to, or will have to, redistribute resources from existing programs to ones specifically designed to address [state election officials'] challenged practices."[130] The court concluded that the organizations did have standing, because "[t]he diversion of resources from general voting initiatives or other missions of the organization to programs designed to address the impact of the specific conduct of the Defendants satisfies the injury-in-fact prong."[131]

Although the organizational Plaintiffs in this action make very similar allegations, the nature of Defendants' conduct – the conduct to which the organizations allege they are responding by diverting resources – is distinguishable. In *Raffensperger*, the challenged policies included state officials' "enforcing the 'Use it or Lose it' statute [which

---

[128] Rec. Doc. No. 47, p. 12.
[129] *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251 (N.D. Ga. 2019).
[130] *Id.* at 1267.
[131] *Id.*

purged voters from the registration rolls], enforcing the Exact Match policy [which automatically rejected a voter's registration application if the provided data did not exactly match data in existing state and federal databases], failure to secure voter registration data, failure to secure voting machines, promoting poll closures, maintaining inaccurate voter rolls, failing to provide adequate resources, and failing to properly train election officials on provisional and absentee ballots."[132]

These allegations strike the Court as distinguishable from the instant case in two important respects. First, *Raffensperger* is a 2019 case and thus free from the tangled issues of causation present here, where the organizational Plaintiffs' diversion of resources is arguably attributable not to Defendants' conduct but to a global pandemic that has caused resources to be diverted by nearly every individual and organization in society. Second, the organizational plaintiffs in *Raffensperger* were challenging policies that had the effect of making it more *difficult* to vote – e.g. purging voter rolls, closing polls, and improperly rejecting voter registration applications. By contrast here, Defendants' Emergency Election Plan *expands* access to voting, albeit not as much as Plaintiffs would prefer. In the face of expanded voting access, it is more difficult for Plaintiffs to show that they have "diverted significant resources to *counteract* the defendant's conduct."[133] Plaintiffs are not *counteracting* Defendant's conduct; they are helping the individuals they serve to vote, under unprecedented circumstances.

---

[132] *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1268 (N.D. Ga. 2019).
[133] *NAACP*, 626 F.3d 233 at 238.

Document Number: 60803

4)      Crescent City Media Group

The final organizational Plaintiff is Crescent City Media Group ("CCMG"), "a community engagement and media production agency based in New Orleans."[134] CCMG exists "to address disparities in civic engagement and political education in communities of color in Louisiana."[135] To that end, CCMG conducts "civic engagement trainings, voter registration campaigns, census education, mutual aid and direct service, and voter education."[136] CCMG alleges that "much of [its] planned work has been put on hold" because it is now "using its limited resources to acquire and produce masks and other personal protective materials to provide to voters who will be forced to cast a ballot in person this year because they do not qualify for an absentee ballot under the Excuse Requirement."[137] CCMG alleges that it will "provide direct support at polling places by handing out hand sanitizer and information on social distancing."[138] Now, CCMG is engaged in "educating voters about the Emergency Election Plan, explaining and training voters on the Excuse Requirement [and] doing radio and television public service announcements about what voters can do to protect themselves from COVID-19 infection while complying with the Witness Requirement."[139] The above activities, CCMG explains, will take away from the time and money it would have otherwise spent on "activities relating to the Census, voter registration drivers, and redistricting."[140]

---

[134] Rec. Doc. No. 47, p. 10.
[135] *Id.*
[136] *Id.*
[137] Rec. Doc. No. 47, p. 11.
[138] *Id.*
[139] *Id.*
[140] *Id.*

Document Number: 60803

Naturally, CCMG would prefer to operate in an environment where the Virus had not interjected significant uncertainty into the voting process. But the fact that they are engaged in voter education efforts – which is part of their stated mission – does not constitute a diversion of resources that gives rise to an injury-in-fact. The shift in resources and priorities described by CCMG is attributable not to the state's efforts to amend state election procedures in light of the Virus, but rather to the Virus itself. If there is an individual, a business, an organization, or a government entity that has gone unaffected by the explosion of the Virus onto the scene this spring, the Court is not aware of it. Many tragic effects have followed, and CCMG's efforts to ameliorate the impact of the Virus on Louisiana citizens are admirable. But CCMG does not acquire standing to sue Defendants by alleging that its resources have been diverted and plans upended, when (1) the cause of that diversion is the Virus and (2) the diversion does not frustrate its mission but, in fact, complements it.

It is not lost on this Court that, as Plaintiffs point out, "Louisiana is just one of four states that have refused to relax their excuse requirements so that all voters can vote absentee during this pandemic."[141] On this topic, the United States Constitution is clear: the "Times, Places, and Manner"[142] of these elections is a matter left to the states. During this election cycle, Louisiana state officials have exercised their statutory authority to put in place an Emergency Election Plan. Secretary of State Ardoin proposed an original version of the Emergency Election Plan that would have gone much further to relax the Challenged Provisions in this lawsuit. Indeed, Plaintiffs aver that the original plan "would

---

[141] Rec. Doc. No. 36, p. 13.
[142] Article I, Section 4.

Document Number: 60803

34

have substantially reduced the risk of voters being exposed to COVID-19."[143] However, the original plan was "blocked by the Louisiana legislature."[144] The question before the Court is not whether the Emergency Election Plan that was eventually adopted is in line with the actions taken in other states, or whether the Plan comports with the preferences of Louisianans. The question is whether that Plan is constitutional. As the Fifth Circuit in *Texas Democratic Party v. Abbott* explained, "we need not—and will not—consider the prudence of [the state's] plans for combating the Virus when holding elections. Instead, we must decide only whether the challenged provisions . . . run afoul of the Constitution, not whether they offend the policy preferences of a federal district judge."[145] Here, this Court does not reach the merits of Plaintiffs' claims because it finds that they have failed to adequately allege an injury-in-fact sufficient to give rise to standing under Article III or because the demonstrated injury is not traceable to state action. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[146] The need to establish jurisdiction before proceeding is even more essential in cases like this, given the Supreme Court's warning "that lower federal courts should ordinarily not alter the election rules on the eve of an election."[147] This Court has no jurisdiction where Plaintiffs have not shown that the actions of Defendants – who, though they may not have expanded voting opportunities as much as Plaintiffs would prefer, undeniably expanded them – have caused them injury.

---

[143] Rec. Doc. No. 47, p. 3.
[144] *Id.*
[145] *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *5 (5th Cir. June 4, 2020).
[146] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).
[147] *Republican Nat'l Comm.,* 140 S. Ct. 1205, 1207 (2020).

Document Number: 60803

## III.   CONCLUSION

For the reasons stated above, the Attorney General's *Motion to Dismiss*[148] is hereby GRANTED and Plaintiffs' claims against all Defendants are dismissed with prejudice. Because the dismissal is on standing grounds, the Court does not reach the Attorney General's 12(b)(6) argument, his argument for required joinder under 12(b)(7), or his argument that Plaintiffs' suit is barred by political question doctrine. The hearing on the *Motions for Preliminary Injunction* set to begin June 24, 2020[149] is hereby CANCELED. Additionally, the *Motion for Extension of Time*[150] filed by the Attorney General and Secretary Ardoin is hereby DENIED as MOOT.

**IT IS SO ORDERED**.

Signed in Baton Rouge, Louisiana on June 22, 2020.

_____
**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[148] Rec. Doc. No. 35.
[149] Rec. Doc. No. 28.
[150] Rec. Doc. No. 64.
Document Number: 60803

36