UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

League of Women Voters of Minnesota
Education Fund, Vivian Latimer Tanniehill,
Isabel Bethke, and Malea Marxer,

File No. 20-cv-1205 (ECT/TNL)

       Plaintiffs,

v.

**OPINION AND ORDER**

Steve Simon, in his official capacity as
Secretary of State of Minnesota,

       Defendant,

and

The Republican National Committee and
Republican Party of Minnesota,

       Intervenors.

---

Danielle M. Lang, Caleb Jackson, Jonathan Diaz, and Mark Gaber, Campaign Legal Center, Washington, DC; and Julia Dayton Klein and Amy E. Erickson, Lathrop GPM LLP, Minneapolis, MN, for Plaintiffs League of Women Voters of Minnesota Education Fund, Vivian Latimer Tanniehill, Isabel Bethke, and Malea Marxer.

Cameron T. Norris and Thomas R. McCarthy, Consovoy McCarthy PLLC, Arlington, VA; and Richard G. Morgan, Lewis Brisbois, Minneapolis, MN, for Intervenors The Republican National Committee and Republican Party of Minnesota.

---

In this case brought under 42 U.S.C. § 1983, Plaintiffs assert three distinct constitutional challenges to Minnesota's absentee-ballot witness requirements. (1) Plaintiffs allege that the absentee-ballot witness requirements as applied to elections during the COVID-19 pandemic unduly burden the right to vote in violation of the First

and Fourteenth Amendments.   (2) Plaintiffs allege that the witness requirements are facially invalid because they impose excessively restrictive witness qualifications, unduly burdening the right to vote in violation of the First and Fourteenth Amendments. (3) Plaintiffs allege that the witness requirements are facially invalid because they deny equal protection on account of citizenship status in violation of the Fourteenth Amendment. Plaintiffs seek injunctive and declaratory relief "permitting Minnesota voters to vote by absentee ballot in elections conducted during the COVID-19 pandemic without involving a witness, as well as permanent relief from Minnesota's . . . qualification requirements for who may serve as a witness." Am. Compl. ¶ 7 [ECF No. 69].

Intervenors—The Republican National Committee and Republican Party of Minnesota—have moved to dismiss Plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and their motion will be granted in part and denied in part.[1]   Intervenors argue that Plaintiffs' as-applied challenge to the in-pandemic enforcement of Minnesota's witness requirements is not justiciable, meaning there is not subject-matter jurisdiction over this claim.   Though it seems like a close call, the better conclusion is that there is subject-matter jurisdiction over this claim because Plaintiffs support their as-applied challenge by plausibly alleging a substantial risk of future injury. Intervenors seek Rule 12(b)(6) dismissal of Plaintiffs' facial undue-burden challenge to the witness requirements, and Eighth Circuit precedent requires dismissal of this claim on its

---

[1]   Defendant Secretary of State Steve Simon did not respond or appear in connection with Intervenors' motion.

merits.  Finally, Intervenors challenge Plaintiffs' facial equal-protection/citizenship-status claim on both jurisdictional and merits grounds.  The doctrine of third-party standing precludes the exercise of subject-matter jurisdiction over this claim.

Plaintiffs and Intervenors share an understanding of the relevant election statutes. As a general rule in Minnesota, any eligible voter may vote by absentee ballot. Minn. Stat. § 203B.02, subd. 1 (2020).  Minnesota uses the term "absentee ballot" to refer to absentee voting that occurs away from a designated polling place (*e.g.*, a voter marks a ballot in her residence) and that involves use of the mail or some other method to deliver the absentee ballot to an appropriate government official.   Minn. Stat. § 203B.08. Minnesota also uses the term "absentee ballot" to refer to voting that occurs before election day in-person at a designated polling place.   Minn. Stat. § 203B.081.   The challenged witness requirements apply only to absentee voting that occurs away from a designated polling place.  *See* Minn. Stat. §§ 203B.07, subd. 3; 203B.08; 203B.081.  The witness must be "a person who is registered to vote in Minnesota or . . . a notary public or other individual authorized to administer oaths[.]"  Minn. Stat. § 203B.07, subd. 3.   Under the controlling statute, the witness must sign a statement that:

> (1) the ballots were displayed to that individual unmarked;
>
> (2) the voter marked the ballots in that individual's presence without showing how they were marked, or, if the voter was physically unable to mark them, that the voter directed another individual to mark them; and
>
> (3) if the voter was not previously registered, the voter has provided proof of residence as required by [Minnesota law].

*Id.*, subd. 3(1)–(3).  In addition to these requirements, a rule promulgated by the Secretary

of State requires the witness to "certify" that "the voter enclosed and sealed the ballots in the ballot envelope" and that the witness "[is or ha[s] been registered to vote in Minnesota, or [is] a notary, or [is] authorized to give oaths."  Minn. R. 8210.0600, subp. 1a, 1b.  If the voter was not previously registered, the rule requires the witness to "certify" that "the voter registered to vote by filling out and enclosing a voter registration application in th[e] envelope[.]"  *Id.*, subp. 1b.

I

In Count I of their operative Amended Complaint, Plaintiffs allege that "[a]s applied to elections conducted during the pendency of the COVID-19 pandemic, Minnesota's witness requirement for absentee voting constitutes a severe burden on the right to vote [in violation of the First and Fourteenth Amendments] because it forces voters to choose between exercising the franchise and violating social distancing guidelines, thus exposing themselves, their families, and their communities to a heightened risk of COVID-19."  Am Compl. ¶ 106.  This is so, Plaintiffs allege, because providing "the required signed witness statement" makes it "difficult or impossible for the voter and witness to maintain a constant distance of at least six feet between them throughout the voting process[]" and requires the voter and witness to touch the same document.  *Id.* ¶¶ 56–57.  Plaintiffs allege that "[t]he voter-witness interaction required by Minnesota's current absentee voting procedure constitutes a violation of recommended social distancing and creates a substantial risk of COVID-19 transmission[.]"  *Id.* ¶ 58. Plaintiffs seem to acknowledge that many Minnesotans do not face this "severe burden."  For example, voters who share a household with an individual who qualifies as a witness (*i.e.*, "a person who is registered to vote in

4

Minnesota or . . . a notary public or other individual authorized to administer oaths," Minn. Stat. § 203B.07, subd. 3) risk nothing to comply with the witness requirements. *See* Am. Compl. ¶¶ 12, 59, 60–61. Though Plaintiffs allege that "large-scale in-person voting" is dangerous during the COVID-19 pandemic, *id.* ¶ 37, Plaintiffs acknowledge that "1.38 million voters voted at a polling place[]" in Minnesota during the 2020 general election, *id.* ¶ 39. Plaintiffs say that Minnesota's interests in preventing voter fraud and the appearance of election integrity may be "fully vindicated without the witness requirement[,]" and therefore are insufficient to warrant enforcing the witness requirements in any election in Minnesota "during the COVID-19 pandemic." *Id.* ¶ 107.

Intervenors seek dismissal of this claim for lack of subject-matter jurisdiction. Intervenors argue that this claim is not justiciable because it concerns only November 2021 elections that will occur under unknown and unpredictable COVID-19 conditions. Mem. in Supp. at 4–7 [ECF No. 78]. According to Intervenors, "it is simply unknown how the public-health situation will develop in the coming months, let alone how matters will stand when the next elections relevant to Plaintiffs take place." *Id.* at 6. Intervenors' argument might be formulated several ways, but the point seems clear enough: Plaintiffs' as-applied challenge invites a decision on hypothetical facts, something Article III forbids. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." (citation omitted)).

Plaintiffs disagree. As Plaintiffs characterize this claim, it is not just about November 2021 elections, but also concerns enforcement of the witness requirements in

ongoing local elections.  Pls.' Mem. in Opp'n at 8 [ECF No. 83].  Regardless, Plaintiffs argue that whatever threat COVID-19 may pose in connection with the November 2021 elections, it is enough that COVID-19 posed a public-health emergency when Plaintiffs filed their Amended Complaint in December 2020 and that it continues to pose a public-health threat today.  *Id.* at 5–10.  As Plaintiffs put it: "As long as the pandemic continues to alter the way of life for Minnesotans, Plaintiffs have standing to bring their as-applied challenge to Minnesota's [witness requirements]."  *Id.* at 6.

The Parties' arguments implicate settled principles necessary to preserve separation of powers among the federal branches and to ensure that federal courts stay in their case-and-controversy lane:

> Federal jurisdiction is limited by Article III, § 2, of the U.S. Constitution to actual cases and controversies.  Therefore, the plaintiff's standing to sue "is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an "injury-in-fact," (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

*Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000).  An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted).  "[P]rimarily future injuries . . . 'may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'"  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (quoting *Susan B. Anthony List v.*

*Driehaus*, 573 U.S. 149, 158 (2014)).  "[S]tanding is based on the facts as they existed at the time the lawsuit was filed."  *Steger*, 228 F.3d at 893.  Standing "must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citations and internal quotation marks omitted).

"At least one plaintiff must have standing to seek each form of relief requested in the complaint."  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). An organization may show standing on its own behalf "when there is a concrete and demonstrable injury to [the] organization's activities which drains its resources and is more than simply a setback to its abstract social interests."  *Nat'l Fed. of Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  "A membership organization may sue on behalf of its members if three criteria are satisfied. Its members must have standing to sue, the interests it seeks to protect must be germane to its own purpose, and neither the claim asserted nor the relief requested may demand the participation of the individual members."  *Nat'l Fed'n of Blind of Mo.*, 184 F.3d at 981 (citing *Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)).

"[T]he party invoking federal jurisdiction . . . bears the burden to establish these elements, and [that party] must support each element 'in the same way as any other matter on which the plaintiff bears the burden of proof.'"  *Azarax, Inc. v. Syverson*, ___ F.3d ___, No. 19-2927, 2021 WL 853291, at *1 (8th Cir. Mar. 8, 2021) (quoting *Lujan*, 504 U.S. at 561)).  In a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, the extent of this burden depends on whether the movant has made a facial or factual attack.

*Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  "In a facial attack, the court merely needs to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015) (cleaned up). "Conversely, in a factual attack, the existence of subject matter jurisdiction is challenged in fact, irrespective of the pleadings, and matters outside the pleadings . . . are considered." *Id.* at 914–15 (cleaned up).  Here, Intervenors bring a facial challenge to subject-matter jurisdiction.  Mem. in Supp. at 3–7.  Therefore, as with a Rule 12(b)(6) motion to dismiss for failure to state a claim, all factual allegations in Plaintiffs' Amended Complaint are accepted as true and all reasonable inferences are drawn in favor of Plaintiffs.  *See Osborn*, 918 F.2d at 729 n.6.  "The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).[2]

---

[2]    Plaintiffs argue that Article III standing may be pleaded through general allegations. It is true that the Supreme Court has written, in the context of "a Rule 12(b) motion to dismiss on the pleadings," that "we must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations[]" regarding Article III's requirements. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).  It is tempting to think that this statement reflected only the retired "no set of facts" pleading standard from *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  *National Wildlife Federation* supports this understanding.  There, Justice Scalia, writing for the majority, cited *Conley* for the proposition that "a Rule 12(b) motion to dismiss on the pleadings . . . presumes that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Wildlife Fed'n*, 497 U.S. at 889.  The Eighth Circuit, however, has continued to say that the general-allegations standard applies to a complaint's Article III standing allegations. *Sarasota Wine Market, LLC v. Schmitt*, 987 F.3d 1171, 1178 (8th Cir. 2021); *Miller v.*

The theory underlying Count I establishes what an individual Plaintiff must allege to show Article III injury with respect to this claim.  To recap, Plaintiffs allege that compliance with Minnesota's absentee-ballot witness requirements unduly burdens the right to vote of individuals who do not share a household with an individual who is qualified to serve as a witness during the COVID-19 pandemic.  *See* Am. Compl. ¶¶ 12, 39, 57–61, 106–107.  Therefore, pleading Article III injury requires an individual Plaintiff to plausibly allege: (1) she is eligible to vote in a Minnesota election; (2) she will vote in that election by absentee ballot away from a designated polling place, thus subjecting her to the witness requirements; (3) she does not share a household with an individual who is qualified to serve as a witness; and (4) she suffers the asserted burden with respect to an ongoing election or, with respect to a future election, that the burden is "certainly impending or there is a substantial risk that the harm will occur.'"  *Susan B. Anthony List*, 573 U.S. at 158 (citation and internal quotation marks omitted).

The Amended Complaint includes no allegations plausibly showing that one of the individual Plaintiffs is experiencing the asserted burden in connection with an ongoing election.   "Plaintiff Vivian Latimer Tanniehill is a registered voter in Woodbury, Minnesota." Am. Compl. ¶ 14.  "Plaintiff Isabel Bethke is a registered voter in St. Paul, Minnesota."  *Id.*  ¶ 15.  And Plaintiff Malea Marxer is eligible to vote and resides in Wayzata, Minnesota, though she may attend college in another state.  *Id.* ¶ 17.  The

---

*Thurston*, 967 F.3d 727, 734–35 (8th Cir. 2020).   Whatever its precise contours, the general-allegations standard is not understood to impose a pleading standard less demanding than the plausibility floor of *Twombly* and *Iqbal*.

Amended Complaint identifies no ongoing elections in any of these cities or in which any of these individual Plaintiffs are eligible or intend to vote. *See id.* ¶¶ 26–27. The Amended Complaint includes the allegation that certain "[t]ownship [e]lections are scheduled to take place on March 9, 2021," *id.* ¶ 27, but those elections are in the past. Regardless, no allegation suggests that any of the individual Plaintiffs intended to vote or voted in a March 2021 township election. The Amended Complaint also alludes to spring 2021 elections in the cities of Brooklyn Park and Bloomington, but no allegation suggests that any of the individual Plaintiffs are eligible to vote in these elections.

Though it could have been clearer, the better answer is that the Amended Complaint includes allegations plausibly showing that Bethke is substantially likely to suffer Article III injury relative to an election for which absentee voting is scheduled to begin September 17, 2021.[3] It is plausible that Bethke will vote by absentee ballot in the November 2 St. Paul mayoral election. Bethke is a registered voter and a St. Paul resident. *Id.* ¶ 15. She endured some difficulty to vote by absentee ballot in the November 2020 elections, shortly after moving to Minnesota. *Id.* ¶¶ 15–16. It seems plausible—especially considering the trouble she went through to vote in 2020—to infer that Bethke intends to vote in 2021. Though Bethke succeeded in identifying a neighbor to witness her absentee ballot in the November 2020 elections, the Amended Complaint says this occurred "despite the

---

[3]     The Amended Complaint identifies no 2021 election in which Tanniehill might vote. *See* Am. Compl. ¶¶ 14, 27. Its allegations regarding Marxer are quite indefinite. We do not know where she will reside in 2021. *Id.* ¶ 17 (alleging she is "considering a transfer" to a college in another state); ¶ 27 (alleging she "lives" in Wayzata). And, unlike Bethke, there is no allegation that, if Marxer remains in Minnesota, she does not share a household with a qualified witness.

recommendations of public health officials to avoid contact with people outside her household[]" and "during the height of the COVID-19 pandemic." *Id.* ¶ 16. The plausible inference is that she is personally concerned about the health risks posed by compliance with the challenged witness requirements during the COVID-19 pandemic. *See id.* ¶ 40 ("Bethke voted by absentee ballot in the 2020 elections because [she] feared contracting and/or spreading COVID-19 if [she] voted in person."). She does not share a household with a qualified witness. *Id.* ¶¶ 15–16.[4]

The Amended Complaint also includes allegations—essential to the conclusion that Bethke plausibly alleges an Article III injury—plausibly showing that, with respect to November 2021 elections (including the St. Paul mayoral election), the asserted burden imposed by the witness requirements in the COVID-19 pandemic is "certainly impending or there is a substantial risk that the harm will occur.'" *Susan B. Anthony List*, 573 U.S. at 158. The Amended Complaint contains many allegations plausibly showing that the COVID-19 pandemic existed when the Amended Complaint was filed, Am. Compl. ¶¶ 29–35, and that the risks posed by COVID-19 are heightened for absentee voters whose ballots must be witnessed by individuals from outside the voters' households, *id.* ¶¶ 35, 42–58. The Amended Complaint anticipates the possibility that "COVID-19 infection rates may decline over the next few months, particularly in light of the approval of vaccine

---

[4]     The answer to these issues would have been clearer had Plaintiffs simply alleged that, owing to the COVID-19 pandemic, Bethke intended to vote by absentee ballot in the November 2, 2021 St. Paul mayoral election. Regardless, her allegations permit these inferences, and "Article III standing is not a technical code pleading requirement." *Thurston*, 967 F.3d at 734.

treatments by the U.S. Food and Drug Administration[,]" but plausibly alleges that "subsequent resurgences" and the length of time it will likely take to achieve widespread vaccination and immunity mean that COVID-19 will continue to pose a substantial public-health risk in connection with November 2021 elections, for which absentee voting begins in September 2021. *Id.* ¶ 32. In other words, Plaintiffs plausibly allege a certainly impending threat that an ongoing COVID-19 pandemic and Minnesota's absentee-ballot witness requirements will combine to burden the right to vote of Bethke (and individuals like her who do not share a household with an individual who is qualified to serve as a witness) in connection with fall 2021 elections.

The Amended Complaint also includes allegations plausibly showing that the League has Article III standing with respect to this claim. Like the individual Plaintiffs, the League alleges no injury relative to an ongoing election. Though the Amended Complaint refers to township elections "scheduled to take place on March 9, 2021," Am. Compl. ¶ 27, those are in the past, and no allegations hint the League was involved in those elections. The League does, however, plausibly allege injury on its own behalf relative to fall 2021 elections. The Amended Complaint includes extensive allegations describing the League's voter-education and registration activities in Minnesota. *Id.* ¶ 12. The League also alleges that, if Minnesota's absentee-ballot witness requirements are enforced for 2021 elections, it will "divert resources[] away from its core activities in order to educate voters about the witness requirement and, to the extent possible, help them comply." *Id.* ¶ 13. The League describes this resource diversion in some detail:

> In the run up to the 2020 elections, in response to requests from its chapters across the state and its own assessment that the COVID-19 pandemic would cause unprecedented demand for absentee ballots, [the League] developed a communications campaign to educate voters about the process for voting by absentee ballot.   A major purpose of this anticipated communications campaign was to inform voters that absentee voting requires a witness, and that the witness must be a registered Minnesota voter, a notary, or another individual authorized to administer oaths.   If not for the witness requirement, [the League] would not have needed to spend the amount of time, money, and other resources it did prior to the witness signature requirement's suspension on educating voters about the absentee voting process.   Absent a continuation of this suspension, [the League] will be forced to divert resources anew to addressing the witness requirement.

*Id.* ¶ 65; *see id.* ¶¶ 66–68.  Again, essential to the conclusion that the League alleges Article III injury, the Amended Complaint includes allegations plausibly showing that, with respect to fall 2021 elections, there is a substantial risk that the asserted burden imposed by the witness requirements in the COVID-19 pandemic will occur.  *Supra* at 10–12.[5]

Intervenors have a point: we could not have known in December 2020 (when Plaintiffs filed their Amended Complaint), and we cannot know today, whether or precisely how COVID-19 may impact November 2021 elections.  From this premise, Intervenors argue that Plaintiffs' as-applied challenge to Minnesota's absentee-ballot witness requirements cannot be justiciable because any future injury Plaintiffs might experience is "conjectural or hypothetical" and "dependent on contingent future events that may not

---

[5]      The absence of briefing and argument regarding whether "the claim asserted [or] the relief requested may demand the participation of the [League's] individual members[,]" *Nat'l Fed'n of Blind of Mo.*, 184 F.3d at 981, counsels against deciding here whether the League has standing to sue on behalf of its members.

occur as anticipated, or indeed may not occur at all."  Mem. in Supp. at 5 (cleaned up)

(citing *Trump v. New York*, 141 S. Ct. 530, 535 (2020)).  The problem with this argument

is that it invites judging Plaintiffs' factual allegations, not by their plausibility, but against

the (albeit commonsense) notion that the pandemic's future is uncertain and its impact on

fall 2021 elections may be insignificant or even negligible.  Allegations of future injury

need not lack uncertainty to be plausible.  The law is better understood to require only that

Plaintiffs allege facts plausibly showing a certainly impending or substantial risk of harm,

and the better conclusion is that they have.

## II

Plaintiffs allege in Count II that Minnesota's limits on who may witness an absentee

ballot "impose an undue burden on the right to vote and violate the First and Fourteenth

Amendments, insofar as they prevent Minnesota voters from having their absentee ballots

witnessed by competent adults who are not registered Minnesota voters, notaries, or

individuals authorized to administer oaths."  Am. Compl. ¶ 114; *see* Minn. Stat. § 203B.07,

subd. 3.  Plaintiffs allege that "it can be difficult or impossible to find another registered

Minnesota voter who is willing and able to serve as a ballot witness."  *Id.* ¶ 111.  "If a voter

fails to find another registered Minnesota voter," Plaintiffs allege that it "may be difficult

or impossible to find" a notary or other individual who is authorized to administer oaths.

*Id.* ¶ 112.  Further, Plaintiffs allege, "if the only witness available is a notary, the voter will

ordinarily need to present additional identification and pay a fee to have her" ballot

properly witnessed.  *Id.*  Plaintiffs allege that "Minnesota derives no appreciable benefit

from excluding from the pool of potential witnesses all adults who are not registered

Minnesota voters, notaries, or persons authorized to give oaths." *Id.* ¶ 113. Plaintiffs allege that these burdens exist "[r]egardless of the public health conditions." *Id.* ¶ 111; *see id.* ¶¶ 90 (alleging that these limitations are unduly restrictive beyond the COVID-19 pandemic); 99 (alleging that "[e]ven before the pandemic," these limitations "prevented a significant number of Minnesotans from casting absentee ballots"). With respect to this claim, Plaintiffs seek a declaratory judgment that Minnesota statutes and rules—"insofar as they prevent competent adults who are not registered Minnesota voters, notaries, or individuals authorized to administer oaths from serving as witnesses for absentee or mail ballots—facially violate the First and Fourteenth Amendments[.]" *Id.* at 33, ¶ 3. Plaintiffs seek no relief that is unique to any of them or any one Plaintiff's circumstances. *See id.* at 32–34, ¶¶ 1–7.

Plaintiffs assert their facial challenge to these restrictions under the *Anderson-Burdick* framework. Mem. in Opp'n at 16. Named for the cases from which the claim is derived—*Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)—the *Anderson-Burdick* framework "require[s] that a court evaluating a constitutional challenge to an election regulation weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008) (plurality opinion) (cleaned up). "Where a statute imposes a severe burden on a plaintiff's rights, it must be 'narrowly tailored and advance a compelling state interest.'" *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). "Lesser burdens, however, trigger less

exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (cleaned up). "A plaintiff seeking relief that would invalidate an election provision in all of its applications bears 'a heavy burden of persuasion[.]'" *Brakebill v. Jaeger*, 905 F.3d 553, 558 (8th Cir. 2018) (quoting *Crawford*, 553 U.S. at 200).

Intervenors argue that Plaintiffs' challenge to Minnesota's absentee-ballot witness restrictions should be dismissed under Rule 12(b)(6).[6]  Specifically, Intervenors argue that the law requires the severity of the challenged election regulation to be determined categorically—that is, by reference to its impact "on all voters, without 'consider[ing] the peculiar circumstances of individual voters.'"  Mem. in Supp. at 8 (quoting *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment)).  Intervenors argue that "[a]ny suggestion that absentee voters *in general* are severely burdened by having to find one registered voter—out of a pool of millions—to witness their ballots would be implausible." *Id.* at 10.  Intervenors point out that "Plaintiffs wisely avoid that suggestion, instead asserting that the burden is severe only 'in some cases.'"  *Id.* (citing Am. Compl. ¶ 111). Plaintiffs' "in-some-cases" theory of their claim, Intervenors contend, does not plausibly show what the law requires: that Minnesota's "witness qualifications are unconstitutional for voters generally."  *Id.*  As Intervenors confirmed at the hearing, their challenge to Count

---

[6]     Intervenors' Rule 12(b)(6) motion is decided with the now-familiar controlling standards in mind.  In reviewing a motion to dismiss for failure to state a claim, all factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in Plaintiffs' favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). The complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

II does not require weighing the burdens and benefits of Minnesota's witness qualifications under *Anderson-Burdick*.

Intervenors' motion thus implicates a purely legal question: To be plausible, must a facial constitutional challenge to a law regulating voting procedures allege a burden on voters generally, or may it merely allege a burden based on the peculiar circumstances of individual voters?  *Crawford*'s answer to this question seems fairly debatable.  There, writing for a three-justice plurality, Justice Stevens described the plaintiffs' claim as "ask[ing] this Court, in effect, to perform a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State's broad interests in protecting election integrity." *Crawford*, 553 U.S. at 200.  Justice Stevens did not reject this claim on the basis that it concerned a "special burden" on a "small number of voters" but instead considered the plaintiffs' evidence and determined that "on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes excessively burdensome requirements on any class of voters."  *Id.* at 202 (internal quotation marks and citation omitted).  In a concurrence joined by two other justices, Justice Scalia appeared to approach the issue differently, explaining that the Supreme Court's "precedents refute the view that individual impacts are relevant to determining the severity of the burden [a challenged law] imposes."  *Id.* at 205 (Scalia, J., concurring in the judgment).  The right question, he explained, is a challenged law's "reasonably foreseeable effect on *voters generally*."  *Id.* at 206.  It is not obvious that the plurality's willingness to decide the case based on the burdens alleged by the *Crawford* plaintiffs—"a somewhat heavier burden [that] may be

17

placed on a limited number of persons," *id.* at 199—meant that it disagreed with the concurring justices' understanding of the law or perhaps instead that the plurality merely thought it wiser to decide the case on a narrower ground. If the plurality and concurrence disagreed on this point of law, it is not explicit.

Though there is disagreement among the federal circuits regarding *Crawford*'s rule in this respect,[7] our Eighth Circuit Court of Appeals is best understood to have resolved the question in *Brakebill* and determined that a showing of excessive burden "on *some* voters" cannot plausibly support a facial constitutional challenge to a law regulating election procedures. *Brakebill*, 905 F.3d at 558. In *Brakebill*, the "North Dakota Secretary of State [moved] to stay an order of the district court that enjoined parts of the North Dakota elections statutes[,]" including one part that "require[d] a voter to present at the polls a valid form of identification that provide[d] the voter's current residential street address." *Id.* at 555. On facial constitutional grounds only, the district court enjoined the Secretary's enforcement of the requirement "that a voter produce identification or a supplemental document with a current residential street address, and ordered that the Secretary accept another form of identification that includes either a current residential street address or a current mailing address (P.O. Box or other address) in North Dakota." *Id.* at 556 (internal

---

[7]      *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 236 (5th Cir. 2020) (finding that "the severity analysis is not limited to the impact that a law has on a small number of voters"); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016) ("Zeroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst."); *id.* at 663 (disagreeing with majority and concluding that "Justice Stevens, quite simply, did not make the same assertion that Justice Scalia made[]" regarding the severity analysis) (Keith, J., concurring in part and dissenting in part).

quotation marks omitted). The district court supported its injunction with evidence

showing "that Native American communities often lack residential street addresses or do

not have clear residential addresses." *Id.* at 557. In granting the Secretary's stay motion,

the Eighth Circuit analyzed the merits of the facial challenge to the statutory requirement

of a residential street address:

> A plaintiff seeking relief that would invalidate an election provision in all of its applications bears "a heavy burden of persuasion," *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 200 (2008) (opinion of Stevens, J.), as facial challenges are disfavored. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–51 (2008). Even assuming that a plaintiff can show that an election statute imposes "excessively burdensome requirements" on *some* voters, *Crawford*, 553 U.S. at 202, (opinion of Stevens, J.) (internal quotation marks omitted), that showing does not justify broad relief that invalidates the requirements on a statewide basis as applied to *all* voters. As the lead opinion in *Crawford* explained, "[w]hen evaluating a neutral, nondiscriminatory regulation of voting procedure, we must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id.* at 203 (internal quotation marks and brackets omitted).

> Here, the district court thought the statutory requirement to produce an identification with a current residential street address posed a legal obstacle to the right to vote for Native Americans, because Native American communities often lack residential street addresses. The Secretary disputes whether street addresses are truly lacking in those communities, and complains that the district court mistakenly relied on outdated evidence about two counties that had not finished assigning addresses as of 2011. But even assuming that some communities lack residential street addresses, that fact does not justify a statewide injunction that prevents the Secretary from requiring a form of identification with a residential street address from the vast majority of residents who have residential street addresses.

*Id.* at 558 (footnote omitted). The court's conclusion that a showing of "'excessively burdensome requirements' on *some* voters . . . does not justify broad relief that invalidates the requirements on a statewide basis as applied to *all* voters" necessarily understands *Crawford* to say that a facial constitutional challenge to a law regulating voting procedures is not plausible if it is based only on burdens tied to the peculiar circumstances of individual voters.[8]

Understanding *Brakebill* this way requires the dismissal of Plaintiffs' facial challenge to Minnesota's absentee-ballot witness limits in Count II of their Amended Complaint. It is true that Count II includes the allegation that the witness restrictions "impose a significant . . . burden on Minnesota voters[]" generally. Am Compl. ¶ 111. But Plaintiffs have not defended this conclusory allegation or the claim with non-conclusory allegations or arguments regarding Minnesota voters generally. In their brief and at the hearing, Plaintiffs defended this claim by arguing that *Anderson-Burdick* and *Crawford* recognize facial challenges to an election law based on burdens the law imposes on "particular populations disparately burdened by a voting restriction." Mem. in Opp'n at 17. To meet this standard, Plaintiffs' allegations concerned the particular circumstances of

---

[8] Plaintiffs argue that *Brakebill* reached the opposite conclusion—*i.e.*, that a facial challenge may be supported with allegations showing a burden on "'*some* voters'" and that "'the courthouse doors remain open' in the Eighth Circuit to *Anderson-Burdick* challenges focusing on the burdens that certain voters uniquely face." Mem. in Opp'n at 18 (quoting *Brakebill*, 905 F.3d at 558–59, 561). Plaintiffs' reliance on *Brakebill*'s "*some* voters" language as support for their position requires ignoring the second half of the sentence in which it appears (where the court explained "that showing does not justify broad relief that invalidates the requirements on a statewide basis as applied to *all* voters," 905 F.3d at 558). And *Brakebill*'s statement that "the courthouse doors remain open" plainly referenced the possibility of as-applied challenges. *Id.* at 561.

"Minnesotans who temporarily reside out-of-state, like Ms. Marxer, and Minnesotans who live in mixed-citizenship households, like Ms. Bethke[.]"  *Id.* at 19.  For Marxer, Bethke, and others in like circumstances, Plaintiffs allege, "the challenge of finding a qualified witness to be able to cast their ballots is more significant than for a voter who resides with another registered Minnesota voter."  *Id.* (citing Am. Compl. ¶¶ 92, 96–98, 100–02). Plaintiffs, in other words, assert a facial challenge to the witness limits based on burdens tied to the peculiar circumstances of individual voters, a claim the Eighth Circuit understands the law to forbid.

At oral argument, Plaintiffs appeared to suggest that their Amended Complaint also should be understood to assert an as-applied challenge to the witness limits and that this as-applied challenge should be allowed to proceed if the facial challenge is dismissed.  If Plaintiffs intended to present that argument, there are problems with it.  (1) Plaintiffs do not seek as-applied relief with respect to Count II in their Amended Complaint; they explicitly seek only facial relief—that is, only relief that "reach[es] beyond the particular circumstances of these plaintiffs."  *Free the Nipple – Springfield Residents Promoting Equality v. City of Springfield*, 923 F.3d 508, 509 n.2 (8th Cir. 2019) (citation omitted); *see* Am. Compl. at 33–34, ¶¶ 3–5.  That is how Intervenors reasonably understood the claim, and that's how Plaintiffs defended it.  (2) The argument was raised for the first time at the hearing.  Plaintiffs' brief cannot reasonably be understood to argue either that Count II asserts an as-applied challenge or that, failing a facial challenge, an as-applied challenge should be allowed to proceed.  *See* Mem. in Opp'n at 16–20.  Federal courts, as a general rule, are not to entertain arguments made by a party for the first time at a hearing.  *Wirtz v.*

*Specialized Loan Servicing, LLC*, 987 F.3d 1156, 1160 (8th Cir. 2021); *Anderson v. Rugged Races LLC*, ___ F. Supp. 3d ___, No. 18-cv-2272 (PJS/HB), 2020 WL 6276017, at *12, n.11 (D. Minn. Oct. 26, 2020).  (3) Plaintiffs' focus on facial relief in Count II is explicit and exclusive and therefore removes the Amended Complaint from that category of complaints that might reasonably be construed to assert facial and as-applied challenges to the same voting regulation.  *See Frank v. Walker*, 819 F.3d 384, 387–88 (7th Cir. 2016). Plaintiffs cited and research has identified no authority for a rule that as-applied challenges should be allowed to proceed whenever facial challenges fail.  (4) Finally, all of this discussion might be beside the point if Plaintiffs remained free to amend the Amended Complaint, but that deadline was December 30, 2020.  Second Am. Pretrial Scheduling Order at 3, ¶ 4(b) [ECF No. 88].  Intervenors' motion to dismiss therefore will be granted with respect to Count II in its entirety.

III

In Count III, Plaintiffs allege that the witness restrictions violate the Equal Protection Clause of the Fourteenth Amendment by discriminating based on citizenship. Am. Compl. ¶¶ 115–23.  The Minnesota Constitution restricts voting eligibility, among other requirements, to individuals who have been United States citizens "for three months." Minn. Const. art. VII, § 1.  In other words, non-citizens are not eligible, and cannot register, to vote in Minnesota.  Therefore, because Minnesota law requires any absentee-ballot witness to be "*a person who is registered to vote* in Minnesota or . . . a notary public or other individual authorized to administer oaths[,]" Minn. Stat. § 203B.07, subd. 3 (emphasis added), any non-citizen who wishes to witness an absentee ballot would have to

22

become a "notary public or other individual authorized to administer oaths." *Id.* Plaintiffs allege that the registered-voter limitation discriminates against non-citizens and fails under any standard of review. Am. Compl. ¶¶ 117, 120–22. Plaintiffs allege that this restriction "proved burdensome" for Bethke specifically during the November 2020 general election. *Id.* ¶¶ 15, 100. Bethke moved to Minnesota in 2020. *Id.* ¶ 15. Her husband "is a German national, and his application for U.S. citizenship is pending." *Id.* "Although the witness signature requirement for absentee ballots was waived for registered voters during the November 2020 election, it was not waived for unregistered absentee voters[,]" like Bethke. *Id.* "Thus, Ms. Bethke was required to have another Minnesota registered voter or notary witness her ballot and voter registration application." *Id.* Because Bethke's husband was not a U.S. citizen—and because he was either unwilling or unable to become a notary or obtain authorization to administer oaths—Bethke successfully identified a neighbor to serve as a witness. *Id.* ¶ 16. There is no non-citizen plaintiff; Plaintiffs therefore seek to assert the constitutional rights of non-parties.

Intervenors seek dismissal of this claim for lack of subject-matter jurisdiction under Rule 12(b)(1) and alternatively on its merits under Rule 12(b)(6). Intervenors argue that Plaintiffs lack third-party standing to prosecute noncitizens' equal-protection rights. Mem. in Supp. at 11–12; Reply Mem. at 13–16 [ECF No. 90]. Failing their jurisdictional challenge, Intervenors argue that this claim falls on its merits because the witness restrictions impose no alienage classification, and if they did, the classification would survive rational-basis review. Mem. in Supp. at 12–14; Reply Mem. at 16–20.

The third-party-standing doctrine is generally considered an exception to a federal court's duty to adjudicate cases and controversies within its jurisdiction. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26, 127 n.3 (2014). "This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Under the doctrine, a litigant ordinarily "'must assert his own legal rights' and 'cannot rest his claim to relief on the legal rights . . . of third parties.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). The Supreme Court has recognized an exception to this prohibition in "circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski*, 543 U.S. at 129–30. The Court "ha[s] limited this exception by requiring that a party seeking third-party standing make two additional showings." *Id.* at 130. First, "the party asserting the right [must have] a close relationship with the person who possesses the right." *Id.* (internal quotation marks omitted). Second, there must be "a hindrance to the possessor's ability to protect his own interests." *Id.* (internal quotation marks omitted). When the right holder faces "some genuine obstacle to" asserting his own rights, his "absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." *Singleton v. Wulff*, 428 U.S. 106, 116 (1976).

Plaintiffs try to meet this two-part test in two ways. Plaintiffs first argue that Bethke has a close relationship with her husband and that he is sufficiently hindered from asserting

a claim in his own right.  Mem. in Opp'n at 12–15.  Intervenors concede that Bethke has a

sufficiently close relationship with her husband, so this argument comes down to whether

Bethke's husband is sufficiently hindered from protecting his own interests.  Reply Mem.

at 13–16.  Second, Plaintiffs argue that "voters—including Plaintiff Bethke and [the

League's] members—seeking to rely on non-U.S. citizen witnesses to their absentee ballots

have the type of relationship to non-U.S. citizen witnesses to justify third party standing."

Mem. in Opp'n at 13.  Intervenors characterize this argument as a "nonstarter" under

*Kowalski*.  Reply Mem. at 14, n.3.

Bethke does not have third-party standing because she has neither alleged nor

identified any hindrance to her husband's ability to protect his own interests.  The only fact

Bethke mentions to support her hindrance argument is that her spouse is a "non-U.S.

citizen[]."  Mem. in Opp'n at 14; *see* Am. Compl. ¶¶ 15 ("He is a German national, and his

application for U.S. citizenship is pending."), 100 (same).[9]  She argues that non-citizens

"often wish to avoid the publicity and controversy of litigation" and that this is especially

true "if they are—like Bethke's spouse—in the midst of seeking legal permanent residency

or other adjustments to their immigration status from the government."  Mem. in Opp'n at

14.  Bethke identifies no specific reason why "publicity and controversy" associated with

this case (or any other aspect of the case) might negatively influence her spouse's path to

lawful permanent residency and citizenship or adversely impact him in some other way.

---

[9]     Plaintiffs mentioned in their brief, Mem. in Opp'n at 14, and clarified at oral
argument, that Bethke's husband has a pending application for lawful permanent residency.

Her argument seems to be that non-citizens as a group are hindered from protecting their own interests. No authority is cited to support this proposition generally.[10]

The three cases Bethke cites to show that non-citizens sometimes face hindrances to protecting their own rights are not binding, address different facts, and are just not persuasive here. The first case Bethke cites, *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027 (11th Cir. 2008), describes specific and meaningful hindrances peculiar to the non-citizen right holders at issue in that case. There, the court determined that a landlord (Young Apartments) had third-party standing to raise its tenants' constitutional rights. *Id.* at 1041–44. The court determined specifically that the non-citizens whose rights the landlord sought to raise faced long-running hostility from the community and held a legitimate "fear of provoking additional policing measures[]" if they raised their own claims. *Id.* at 1044. The court "presume[d]" that these non-citizens reasonably "fear[ed] drawing attention to the immigration status of themselves and their neighbors[]" that could "invite other legal risks." *Id.* at 1044. Nothing like that is alleged here. In the second cited case, *Mayor and City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452 (D. Md. 2019), the court determined "the City's immigrants face significant obstacles in bringing this suit on their own, as they may hold a credible fear that suing the federal government would torpedo the visa application of a family member whom they are sponsoring or seek to sponsor." *Id.* at 490. The court cited no factual allegations or evidentiary material to

---

[10]   Of course, non-citizens often sue to vindicate their rights, *e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017), and they can do so pseudonymously and using other "prophylactic measures" available to protect their legitimate privacy concerns, *Mental Hygiene Legal Serv. v. Cuomo*, 13 F. Supp. 3d 289, 301–02 (S.D.N.Y. 2014).

support this conclusion.  If the court intended to refer implicitly to hindrances faced by the group of non-citizens whose rights the case implicated—immigrants potentially subject to inadmissibility under the "public charge" rule, *see id.* at 470—nothing comparable is alleged or identified here.  This case is distinguishable from *Mayor and City Council of Baltimore* in another respect—there is no relevant connection between the rights Plaintiffs seek to advance in this case and the application for lawful permanent residency filed by Bethke's husband.  This lack of connection makes it difficult to accept that court's concerns over possible retaliation in a case like this where the federal government is not a party.  In the third case Bethke cites, *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016), the court identified "clear" and "significant hindrances" the right holders (Syrian refugees) faced to bringing suit on their own.  *Id.* at 732.  These included that "they [were] newly arrived refugees, escaping political or religious persecution[,]" and that bringing suit on their own would have required them to be adverse to the state official (then-Governor Pence) directly responsible for "suspending the resettlement of Syrian refugees in the State."  *Id.*  Again, nothing comparable is alleged here.[11]

Separate from Bethke's third-party standing based on her spouse, Plaintiffs argue that they (and all "voters") "have the type of relationship to non-U.S. citizen witnesses to

---

[11]    Plaintiffs argue that the required hindrance showing "is not a particularly high hurdle to clear."  Mem. in Opp'n at 13–14.  It is true that the Supreme Court "ha[s] been quite forgiving with [the third-party standing] criteria in certain circumstances." *Kowalski*, 543 U.S. at 130.  Regardless, there is a hurdle to clear, and if Bethke clears it based just on her spouse's non-citizenship and pending application for lawful permanent residency, it's hard to imagine a non-party right holder who wouldn't clear the hindrance hurdle.

justify third party standing."  Mem. in Opp'n at 13.  This contention can't get past *Kowalski*.  There, the plaintiffs were two attorneys seeking to advance "a constitutional challenge to Michigan's procedure for appointing appellate counsel for indigent defendants who plead guilty." 543 U.S. at 127.  The two attorneys sought to vindicate, not their own constitutional rights, but rights belonging to indigent criminal defendants.  *Id.*  To demonstrate they had a close relationship with the right holders, the attorneys "rel[ied] on a future attorney-client relationship with as yet unascertained Michigan criminal defendants who w[ould] request, but be denied, the appointment of appellate counsel, based on the operation of the [challenged] statute." *Id.* at 130 (internal quotation marks and citation omitted).  The Supreme Court rejected this contention, observing that a hypothetical relationship is "no relationship at all." *Id.* at 131.  If a hypothetical attorney-client relationship is insufficient, then so is a hypothetical voter-witness relationship.  *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) ("The relationship between [the organizational plaintiff] AMOS and the persons whom it seeks to help— unidentified, future late jailed voters—does not resemble the close relationship of the lawyer-client or doctor-patient relationships recognized by the Supreme Court.").  Further, as discussed with respect to Bethke's spouse, Plaintiffs identify no hindrance to non-citizens bringing suit on their own other than a general allegation that "non-U.S. citizen ballot witnesses have relatively little incentive to litigate this matter." Mem. in Opp'n at 15.  That broad assertion is not enough to show the requisite hindrance.  *See Powers v. Ohio*, 499 U.S. 400, 414 (1991) (noting that the right possessors faced "daunting" practical barriers to bringing suit on their own).

28

**ORDER**

Based on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Intervenors' Motion to Dismiss Plaintiffs' First Amended Complaint [ECF No. 75] is **GRANTED IN PART AND DENIED IN PART** as follows:

1.  Defendants' motion is **DENIED** insofar as it seeks dismissal of Count I for lack of subject-matter jurisdiction.

2.  Defendants' motion is **GRANTED** insofar as it seeks dismissal of Count II for failure to state a claim upon which relief may be granted.  Count II is **DISMISSED WITH PREJUDICE**.

3.  Defendants' motion is **GRANTED** insofar as it seeks dismissal of Count III for lack of subject-matter jurisdiction.   Count III is **DISMISSED WITHOUT PREJUDICE**.

Dated:  March 29, 2021                          s/ Eric C. Tostrud
                                                Eric C. Tostrud
                                                United States District Court